Homer J. HOLLAND, Howard R. Ross,
and First Bank, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 95–524C.

United States Court of Federal Claims.

Nov. 17, 2006.

David B. Bergman, Arnold & Porter, LLP, Washington, D.C., for plaintiffs. Melvin C. Garbow, Howard N. Cayne, Michael A. Johnson, Joshua P. Wilson, Arnold & Porter, LLP, Washington, D.C., of counsel. Donald J. Gunn, Jr., Sharon R. Wice, Gunn and Gunn, St. Louis, MO, co-counsel for plaintiff First Bank.

John H. Roberson, Trial Attorney, William F. Ryan, Assistant Director, Jeanne E. Davidson, Deputy Director, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, Stuart E. Schiffer, Deputy Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant. Kenneth M. Dintzer, Richard B. Evans, Elizabeth A. Holt, William G. Kanellis, David A. Levitt, John J. Todor, James R. Whitman, United States Department of Justice, Washington, D.C., of counsel.

## OPINION AND ORDER

GEORGE W. MILLER, Judge.

This *Winstar*-related case is before the Court on plaintiff First Bank's motion for summary judgment with respect to liability and for partial summary judgment with respect to damages and defendant's cross-motion for summary judgment with respect to liability and damages. Plaintiff First Bank (hereinafter "plaintiff" whenever the term is used in the singular) filed its motion for summary judgment on liability and partial summary judgment on damages ("Pl.'s Mot.," docket entry 277) on September 21, 2005. Defendant filed a response to First Bank's motion and its cross-motion for summary judgment with respect to liability and damages ("Def.'s Resp.," docket entry 293) on December 7, 2005. Plaintiff filed a reply in support of its motion and response to defendant's cross-motion ("Pl.'s Reply," docket entry 311) on February 6, 2006. Defendant filed a reply in support of its cross-motion ("Def.'s Reply," docket entry 314) on February 24, 2006. On April 18, 2006, defendant filed written responses to questions that the Court presented to the parties in advance of oral argument on defendant's affirmative defense of accord and satisfaction ("Def.'s Oral Arg. Br.," docket entry 327). Plaintiffs (collectively) filed written responses to the Court's questions on April 20, 2006 ("Pls.' Oral Arg. Br.," docket entry 329). The Court conducted oral argument on the affirmative defense of accord and satisfaction on April 21, 2006. After oral argument, the Court ordered supplemental briefing. Defendant filed its supplemental brief on May 19, 2006 ("Def.'s First Suppl. Br.," docket entry 331) and plaintiffs filed their supplemental brief on June 2, 2006 ("Pls.' First Suppl. Br.," docket entry 332). On June 21, 2006, plaintiffs filed a motion for leave to advise the court of a successful argument that defendant had made in another *Winstar*-related case that plaintiffs considered contradictory to a material argument made by defendant in this case ("Pls.' Mot. for Leave," docket entry 333). Defendant filed a response to plaintiffs' motion for leave ("Def.'s Resp. to Mot. for Leave," docket entry 334) on July 10, 2006, in which defendant stated that it did not oppose plaintiffs' motion so long as the Court also accepted defendant's substantive response (set forth in the same document). The Court hereby GRANTS plaintiffs' motion for leave. The Court has considered the substantive content and appended exhibits of both plaintiffs' motion for leave and defendant's response as part of the record on the pending cross-motions for summary judgment. On September 8, 2006, the Court ordered further supplemental briefing. Defendant filed its supplemental brief on September 22, 2006 ("Def.'s Second Suppl. Br.," docket entry 336), plaintiffs filed their supplemental brief on October 6, 2006 ("Pls.' Second Suppl. Br.," docket entry 337) and defendant filed its reply to plaintiffs' supplemental brief on October 20, 2006 ("Def.'s Reply to Pls.' Second Suppl. Br.," docket entry 338).

For the reasons set forth herein, plaintiff's motion for summary judgment on liability is GRANTED IN PART and defendant's cross-motion for summary judgment on liability is DENIED IN PART with respect to breach of the express River Valley I and II contracts, *i.e.*, the Court holds that defendant is liable to plaintiff First Bank for breach of the express contracts. Plaintiff's motion for summary judgment on liability is DENIED

IN PART and defendant's cross-motion is GRANTED IN PART with respect to liability for the phase-out from regulatory capital computations of $5,000,000 of River Valley I preferred stock acquired by FSLIC in connection with the acquisition by plaintiffs Holland and Ross of all the voting stock of River Valley I, *i.e.*, the Court holds that defendant is not liable to plaintiff First Bank for the change in regulatory treatment of the preferred stock. Plaintiff's motion for summary judgment on liability is DENIED IN PART and defendant's cross-motion is GRANTED IN PART with respect to plaintiff's implied-in-fact contract claims, and the Court holds that defendant is entitled to summary judgment in its favor on the claims of all plaintiffs alleging breach of implied-in-fact contracts. The Court will issue a subsequent opinion addressing the parties' cross-motions for summary judgment insofar as they relate to damages.

### PROCEDURAL BACKGROUND

Plaintiffs Holland and Ross filed this action on August 8, 1995. Presently, plaintiffs' Third Amended Complaint seeks damages on behalf of plaintiffs Holland, Ross, and First Bank arising out of defendant's alleged breaches of contracts as a result of the enactment of the Financial Institutions Reform, Recovery and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183 (1989) ("FIRREA"). An account of the factual background of this case is found in Judge Marian Blank Horn's detailed Findings of Fact in *Holland v. United States,* 57 Fed.Cl. 540 (2003) ("*Holland I*"). The background information and facts pertinent to the Court's resolution of the pending motions are set forth herein.

The contracts at issue in this case between the Government, plaintiffs Holland and Ross, and plaintiff First Bank's predecessors-in-interest pertain to two transactions involving the acquisitions of four banking institutions. The first transaction involved the acquisition of three thrifts, Galva Federal Savings and Loan Association of Galva, Illinois ("Galva"),

Home Federal Savings and Loan Association of Peoria, Illinois ("Home"), and Mutual Savings and Loan Association of Canton, Illinois ("Mutual"). *Holland I,* 57 Fed.Cl. at 543. This transaction called for the merger of both Galva and Mutual with and into Home, the conversion of Home into River Valley Savings Bank, F.S.B. ("River Valley I"), and the acquisition of River Valley I by plaintiffs Holland and Ross. *See id.* (This transaction is often referred to in the record as the "Galva, Home, and Mutual transaction," the "River Valley I transaction," or the "River Valley I acquisition." The contractual documents related to the transaction are described as "River Valley I documents.") The second transaction involved the acquisition of Republic Savings and Loan Association of South Beloit, Illinois ("Republic") by River Valley Savings Bank of Rock Falls, Illinois ("River Valley II"). *See id.* at 547. Plaintiffs Holland and Ross owned all of the outstanding stock of River Valley II. *Id.* (This transaction is often referred to in the record as the "Republic transaction," the "River Valley II transaction," or the "River Valley II acquisition." The contractual documents related to the transaction are described as "River Valley II documents." Furthermore, the River Valley entities are sometimes referred to collectively as "River Valley.")[1]

On July 30, 2003, Judge Horn denied defendant's motion to dismiss and motion for partial summary judgment and granted the cross-motion for partial summary judgment on liability of plaintiffs Holland and Ross as to the River Valley I and II contracts. *Holland I,* 57 Fed.Cl. at 570. In denying defendant's motion to dismiss, Judge Horn rejected defendant's argument that Holland and Ross had no contractual rights under the River Valley II and Peoria contracts due to lack of privity, holding that Holland and Ross were themselves parties to the contracts. *See id.* Judge Horn also held that the contract for the Galva, Home, and Mutual acquisitions allowed Holland and Ross to include $5 million in preferred stock purchased by

---

1. Initially, this case also involved claims related to a third transaction involving the acquisition of Peoria Savings and Loan Association of Peoria, Illinois ("Peoria"), thus accounting for references to the Peoria Agreement or to the "three Assistance Agreements." However, plaintiffs are no longer pursuing any claims arising out of the Peoria acquisition.

the FSLIC as regulatory capital and therefore denied defendant's motion for partial summary judgment on that issue. *See id.*

In granting the cross-motion of plaintiffs Holland and Ross, the court found that "defendant breached the contractual rights of the plaintiffs with respect to the Galva, Home, and Mutual transaction after the enactment of FIRREA and issuance of the implementing regulations, which prohibited the plaintiffs from recording FSLIC cash contributions, preferred stock, and subordinated debt as assets for regulatory capital purposes, and from amortizing the goodwill." *Id.* at 565. Likewise, Judge Horn found that "defendant breached the contractual rights of the plaintiffs with regards to the Republic transaction after the enactment of FIRREA and the issuance of the implementing regulations, which prohibited the plaintiffs from recording FSLIC cash contributions and subordinated debt as assets for regulatory capital purposes, and from amortizing the goodwill." *Id.* at 566.

Subsequent to Judge Horn's decision in *Holland I,* this Court determined that, although defendant had been found liable to Holland and Ross for breach of the River Valley I and II contracts, all of the damages that plaintiffs sought to recover belonged to River Valley rather than to Holland and Ross. *See Holland v. United States,* 59 Fed Cl. 735, 739–41 (2004) ("*Holland II*"); *Holland v. United States,* 63 Fed.Cl. 147, 148–150 (2004) ("*Holland IV*"). The Court permitted plaintiffs and First Banks, Inc. ("First Banks," the institution then believed by the parties to be the successor in interest to River Valley) to seek leave to join First Banks as a plaintiff and amend the complaint accordingly. *Holland II,* 59 Fed.Cl. at 742. On October 5, 2004, the Court granted the joint motion of plaintiffs Holland and Ross and First Banks to join First Banks as a plaintiff pursuant to Rule 17(a) of the Rules of the United States Court of Federal Claims ("RCFC") and to file a second amended complaint. *See Holland v. United States,* 62 Fed.Cl. 395 (2004) ("*Holland III*"). Holland,

Ross, and First Banks filed the Second Amended Complaint on October 28, 2004.

Holland, Ross, and First Banks later established that plaintiff First Bank,[2] a second-tier subsidiary of First Banks, Inc., was in fact the direct successor in interest to the damages claims of River Valley. *See Holland v. United States,* No. 95–524C, slip. op. at 2 (Fed.Cl. May 12, 2005) (docket entry 263). Holland, Ross, First Banks, and plaintiff First Bank filed a joint motion to join plaintiff First Bank and to file a third amended complaint, which the Court granted on May 12, 2005. *See id.,* slip. op. at 1, 7. The Third Amended Complaint, filed on May 18, 2005, listed only Homer J. Holland, Howard R. Ross, and First Bank as plaintiffs. In its Order of June 9, 2005 (docket entry 271, denying as moot defendant's motion to dismiss First Banks, Inc.) the Court, therefore, deemed plaintiffs to have substituted plaintiff First Bank for First Banks, Inc. pursuant to RCFC 17(a).

Plaintiff's pending motion for partial summary judgment requests that "the Court ... promptly enter summary judgment holding the government liable to First Bank" based upon the doctrine of law of the case. Pl.'s Mot. at 3. In opposition to plaintiff's motion, and in support of defendant's cross-motion for summary judgment, defendant asserts that an accord and satisfaction provision in a 1991 settlement agreement (*see* the "Facts" section, *infra*) "acts as a complete defense to" First Bank's breach of contract claims. Def.'s Resp. at 28. Defendant did not argue the defense of accord and satisfaction, or otherwise assert that the breach of contract claims had been released, in opposition to the cross-motion for partial summary judgment as to liability filed by plaintiffs Holland and Ross before Judge Horn in *Holland I.* Defendant did, however, assert the defense of accord and satisfaction in its Answer to the Complaint, in its Answer to the Second Amended Complaint (effecting the joinder of First Banks, Inc.), and in its Answer to the Third Amended Complaint (effecting the substitution of plaintiff First Bank for plaintiff

---

2. In the initial filings pertaining to plaintiff First Bank, the parties referred to plaintiff as "First Bank MO" in order to distinguish it from First Banks, Inc. "First Bank" is plaintiff's official corporate title. *See* Third. Am. Compl. ¶ 3.

First Banks, Inc.). Defendant also contends that plaintiff's claims are barred by the failure of plaintiff's predecessors-in-interest to obtain written consent to transfer their rights under the relevant assistance agreements in connection with previous mergers and acquisitions. Def.'s Resp. at 37. Defendant alternatively argues that, even if the Government is found liable, no liability should result from the phase-out of $5,000,000.00 in preferred stock from regulatory capital computations in connection with the River Valley I contract and that the court previously erred in finding such liability. *See id.* at 47–56; *Holland I,* 57 Fed.Cl. at 570. Finally, defendant asserts that River Valley's express contracts with the Government bar First Bank from asserting implied-in-fact contracts covering the same subject matter. Def.'s Resp. at 57–58.

## FACTS [3]

### The River Valley I Contract

On July 28, 1988, the Federal Home Loan Bank Board ("FHLBB") issued Resolution 88–638, authorizing the acquisition by Messrs. Holland and Ross of all the voting stock of River Valley I. *See* Joint App. to Joint Stipulations of Fact (docket entry 119) ("JA") at JA 4987–5004; *Holland I,* 57 Fed. Cl. at 545. The FHLBB therein approved and authorized the execution of an Assistance Agreement on behalf of the Federal Savings and Loan Insurance Corporation ("FSLIC"). *See* JA 4995. Resolution 88–638 authorized River Valley I to issue preferred stock to FSLIC, and authorized FSLIC to purchase the preferred stock "in an amount not to exceed $5,000,000 . . . ." JA 4996; *Holland I,* 57 Fed.Cl. at 545. The resolution authorized River Valley I to issue a $4,600,000 subordinated debenture and further authorized "the inclusion in [River Valley I's] regulatory capital of such subordinated debenture in accordance with § 561.13 of the Insurance Regulations, 12 C.F.R. § 561.13 (1988)" subject to certain conditions. JA 4997; *Holland I,* 57 Fed.Cl. at 545. The "Accounting" section of the resolution provided, in relevant part, that

River Valley I was to account for the mergers and stock acquisitions, and report to the FHLBB and FSLIC, "in accordance with generally accepted accounting principles . . . as accepted, modified, clarified, or interpreted by applicable regulations of the Bank Board and the FSLIC," except to the extent of the following departures from generally accepted accounting principles ("GAAP"):

(a) Eight million dollars of the initial contribution by the FSLIC to River Valley, and four million six hundred thousand dollars of the principal amount of the Subordinated Debenture issued to American National Bank and Trust Company of Chicago, pursuant to § 6 of the Assistance Agreement, shall be credited to the regulatory capital account of River Valley in accordance with the forbearance letter authorized pursuant to this resolution; and

(b) The value of any unidentifiable intangible assets resulting from the application of push-down accounting in accounting for the Mergers and Stock Acquisition may be amortized by River Valley over a period not in excess of twenty-five (25) years by the straight line method. . . .

JA 5000–01; *Holland I,* 57 Fed.Cl. at 545–56.

Also on July 28, 1988, FHLBB sent a letter to plaintiff Holland, as President and Chief Executive Officer of River Valley I, granting certain regulatory forbearances regarding the River Valley I transaction. *See* JA 5005–07; *Holland I,* 57 Fed.Cl. at 546. The forbearance letter provided that a "portion of the [FSLIC] cash contribution not to exceed $8.0 million may be credited to River Valley's regulatory capital; therefore, for regulatory accounting purposes, River Valley may book such contribution as a direct addition to its regulatory capital" subject to certain limitations. JA 5006; *Holland I,* 57 Fed.Cl. at 546. The letter also stated that "[f]or purposes of reporting to the Bank Board, the value of any intangible asset resulting from the application of push-down accounting in accounting for the purchases,

---

3. Although plaintiff and defendant have submitted proposed findings of uncontroverted fact and responses objecting to many of their adversary's proposed findings, the facts set forth in this "Facts" section are undisputed.

may be amortized by River Valley over a period not to exceed 25 years by the straight line method." JA 5006; *accord Holland I,* 57 Fed.Cl. at 546.

On July 29, 1988, FSLIC, Holland, Ross, and River Valley I executed the Assistance Agreement for the River Valley I transaction, which was approved and authorized by FHLBB Resolution 88–638. *See* JA 4801–92; *Holland I,* 57 Fed.Cl. at 546. Section 6 of the Assistance Agreement provided that FSLIC would provide to River Valley I a cash contribution of $34,215,888 plus $13,000 per diem from April 1, 1988 to and including the effective date of the agreement. JA 4835; *Holland I,* 57 Fed.Cl. at 546. The Assistance Agreement further stated that "[f]or purposes of reports to the Bank Board ... and all Bank Board regulations applicable to River Valley, Eight Million Dollars ($8,000,000) of the cash contributions made under this § 6(a)(1) and (2) shall be credited to River Valley's net worth account and shall constitute regulatory capital as defined in § 561.13 of the Insurance Regulations, 12 C.F.R. § 561.13 (1988)," subject to certain restrictions. JA 4836–37; *Holland I,* 57 Fed.Cl. at 546–47. The Assistance Agreement also required River Valley I to execute and deliver the $4,600,000 subordinated debenture and provided that "[t]he Subordinated Debenture shall be included in RIVER VALLEY's regulatory capital pursuant to § 561.13 of the Insurance Regulations." JA 4838; *accord Holland I,* 57 Fed.Cl. at 547. Section 23 of the Assistance Agreement contained an integration clause:

> This Agreement, together with any interpretation or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties and supersedes all prior agreements and understandings of the parties in connection with it, excepting only the Subscription for Shares of River Valley Savings Bank, F.S.B., and any resolutions or letters concerning the Transaction or this Agreement issued by the Bank Board or the [FSLIC] in connection with the approval of the Transaction and this Agreement. ...

4. On July 29, 1988, Messrs. Holland and Ross and River Valley I also entered into a Regulatory Capital Maintenance and Dividend Limitation

JA 4884. Section 25 of the Assistance Agreement provided:

> All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of the parties and their respective transferees, successors, and assigns, but this Agreement may not be assigned to any party nor may any rights or obligations under it be transferred or delegated to or vested in any other party, through merger, consolidation, or otherwise, without the prior written consent of the [FSLIC].

JA 4885–86.[4]

Together, these documents constituted the express contract between the Government, Messrs. Holland and Ross, and River Valley I pertaining to the River Valley I transaction. *See generally Holland I,* 57 Fed.Cl. at 562–565 (describing the "Galva, Home and Mutual Contract"). As stated in the "Procedural Background" section, *supra,* Judge Horn concluded in *Holland I* that defendant breached the contractual promises quoted above by the enactment and implementation of FIRREA. *See id.* at 565.

**The River Valley II Contract**

The FHLBB issued Resolution 88–612 on July 27, 1988, authorizing the supervisory conversion of Republic from mutual to stock form and the simultaneous merger of Republic with and into River Valley II. *See* JA 4373–81; *Holland I,* 57 Fed.Cl. at 547. The resolution approved and authorized the execution of an Assistance Agreement on behalf of FSLIC. JA 4378. Resolution 88–612 required River Valley II to "deliver to the FSLIC documentation satisfactory to the FSLIC showing that the issuance and sale of $2,000,000 in subordinated debt to American National Bank has been successfully completed in accordance with 12 C.F.R. § 563.8–1...." JA 4377, *Holland I,* 57 Fed.Cl. at 547–48. The "Accounting" section of the resolution provided that River Valley II was to employ GAAP "except that $5,000,000 of the initial cash contribution by the FSLIC to River Valley, pursuant to § 6(a) of the Assis-

Agreement (the "RCMA") with FSLIC. *See* Section V., *infra.*

tance Agreement, shall be credited to the regulatory capital account of River Valley and shall constitute regulatory capital as defined in § 561.13 of the Insurance Regulation...." JA 4377; *accord Holland I,* 57 Fed.Cl. at 547.

On July 29, 1988, the FHLBB sent a letter to plaintiff Holland, as Vice Chairman of River Valley II. *See* JA 4382–83; *Holland I,* 57 Fed.Cl. at 548. The letter stated that River Valley II was "hereby granted written approval of the Federal Savings and Loan Insurance Corporation ('FSLIC') to issue and include in its regulatory capital ... a subordinated debenture in the aggregate principal amount not to exceed $2,000,000 as calculated in accordance with 12 C.F.R. § 561.13," subject to certain conditions. JA 4382; *Holland I,* 57 Fed.Cl. at 548.

On July 29, 1988, FSLIC and River Valley II executed the Assistance Agreement for the River Valley II transaction, which was approved and authorized by FHLBB Resolution 88–612.[5] *See* JA 4304–71; *Holland I,* 57 Fed.Cl. at 548. Section 6 of the Assistance Agreement required FSLIC to provide to River Valley II "a cash contribution equal to $16,600,000 plus $7,500 per diem for each day after March 31, 1988 until the Effective Date [of the agreement]." JA 4327; *Holland I,* 57 Fed.Cl. at 548. The Assistance Agreement also provided that:

> For purposes of reports to the Bank Board ... and all Bank Board regulations applicable to the ACQUIRING ASSOCIATION, $5,000,000 of the cash contribution made under this § 6(a)(1) shall be credited to the ACQUIRING ASSOCIATION's regulatory capital account and shall constitute regulatory capital as defined in § 561.13 of the Insurance Regulations....

JA 4327; *accord Holland I,* 57 Fed.Cl. at 548. Like the River Valley I Assistance Agreement, Section 23 of the River Valley II Assistance Agreement stated:

> This Agreement, together with any interpretation or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties and

supersedes all prior agreements and understandings of the parties in connection with it, excepting only the Merger Agreement and any resolutions or letters concerning the Transaction or this Agreement issued by the Bank Board or the [FSLIC] in connection with the approval of the Transaction and this Agreement

> ....

JA 4363–64. Section 25 provided:

> All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of the parties and their respective transferees, successors,· and assigns, but this Agreement may not be assigned to any party nor may any rights or obligations under it be transferred or delegated to or vested in any other party, through merger, consolidation, or otherwise, without the prior written consent of the [FSLIC].

JA 4364–65.

On May 18, 1989, the FHLBB sent a forbearance letter to plaintiff Holland, as Vice Chairman of River Valley II, to "confirm[ ] the understanding that the Bank Board and the FSLIC will waive or forbear from taking action to enforce certain requirements" against River Valley. JA 4384; *accord Holland I,* 57 Fed.Cl. at 548. The letter provided that "[a] portion of the cash contribution not to exceed $5.0 million may be credited to River Valley's regulatory capital; therefore, for regulatory accounting purposes, River Valley may book such contribution as a direct addition to its regulatory capital," subject to certain limitations. JA 4385; *accord Holland I,* 57 Fed.Cl. at 548. The letter also stated: "For purposes of reporting to the Bank Board, the value of any intangible asset, resulting from the application of pushdown accounting in accounting for the purchase, may be amortized by River Valley over a period not to exceed 25 years by the straight line method." JA 4385; *accord Holland I,* 57 Fed.Cl. at 548.

These documents collectively comprised the express contract between the Govern-

---

5. The River Valley I and River Valley II Assistance Agreements are referred to collectively as the "Assistance Agreements."

ment, River Valley II, and Holland and Ross with respect to the River Valley II transaction. *See Holland I*, 57 Fed.Cl. at 565–66 (describing the "Republic Contract" and stating "[t]he documents noted above memorialize the contract between Holland and Ross and defendant"). As described in the "Procedural Background" section, *supra*, Judge Horn concluded that defendant breached the promises quoted above by the enactment and implementation of FIRREA. *See id.* at 566.

**The Settlement Agreement**

On August 14, 1991, plaintiffs Holland and Ross, River Valley Savings Bank, F.S.B. (in its own right and as successor by merger to River Valley Savings Bank ("River Valley III," a term of convenience used to describe the post-merger surviving entity, technically River Valley I, after it had acquired River Valley II, *see* Def.'s Resp. at 16)), and the Federal Deposit Insurance Corporation ("FDIC"), in its capacity as manager of the FSLIC Resolution Fund ("FRF"), executed a "Settlement Agreement," which terminated the Assistance Agreements, and is central to the pending cross-motions for summary judgment on liability. *See* Def.'s Supp.App., Ex. 3. Section 1(a) of the Settlement Agreement provided:

> [I]n exchange for the performance by the [FDIC] of its obligations under section 1(b) of this Settlement Agreement, River Valley shall pay to the Manager the sum of [$50,000] (hereinafter the "River Valley Federal Cash Payment"). The River Valley Federal Cash Payment shall constitute full satisfaction of River Valley Federal's obligation to share tax benefits attributable to the net operating losses under sections 3 and 7 of the Peoria Agreement and shall fully discharge River Valley Federal from any obligation or liability in connection therewith.

*Id.* at Ex. 3, § 1(a). Section 1(b) stated:

> [I]n exchange for the performance by River Valley Federal of its obligations under section 1(a) of this Settlement Agreement, the Manager shall pay to River Valley Federal the sum of [$3,276,902.90] ... (hereinafter the "FRF Cash Pay-

ment").... The parties hereto agree that the FRF Cash Payment shall constitute full satisfaction of any and all remaining payments or contributions due or to become due under the Assistance Agreements, and shall fully discharge the Manager and the FRF from any obligation or liability in connection therewith, including, without limitation, any obligation or liability with respect to (I) payments for capital losses, (ii) indemnifications for undisclosed liabilities, unreserved for claims, challenges to the transaction, and related claims, and (iii) claims for accrued but uncollected interest.

*Id.*, § 1(b). Section 5 of the Settlement Agreement (hereinafter the "Accord and Satisfaction clause")[6] further stated:

> Except as otherwise specifically provided herein, performance by each party of its respective obligations under this Settlement Agreement shall effect a complete accord and satisfaction of any and all obligations and liabilities of such party under the Assistance Agreements and, thenceforth, such party shall be fully discharged from any obligation or liability of any kind in connection therewith, including, without limitation, any and all actions, causes of action, suits, debts, sums of money, bonds, covenants, agreements, promises, damages, judgments, claims, and demands whatsoever, known or unknown, suspected or unsuspected, at law or in equity.

*Id.*, § 5. Finally, the parties included an integration clause at Section 8(h) of the Settlement Agreement: "This Settlement Agreement embodies the entire Settlement Agreement among the parties hereto with respect to the subject matters herein and supersedes all prior agreements and understandings among the parties, oral or written, concerning such matters." *Id.*, § 8.

## DISCUSSION

### I. Standard for Decision

The court may grant summary judgment if the record shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

---

**6.** Although Section 5 of the Settlement Agreement was entitled "Accord and Satisfaction," the Court gives no weight to that heading in construing the clause, in accordance with Section 8(g) of the Settlement Agreement, which provides that headings shall not affect the construction of the agreement's provisions.

law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it might affect the outcome of the suit. *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505. An interlocutory summary judgment may be rendered on liability alone although there is a genuine issue concerning the amount of damages. RCFC 56(c).

"The moving party bears the burden of demonstrating the absence of a genuine question of material fact." *O'Connor v. United States,* 308 F.3d 1233, 1240 (Fed.Cir. 2002) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The Court must view the evidence in the light most favorable to the nonmovant and resolve all doubts in the nonmovant's favor. *Id.* (citing *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505). Once the movant has met its burden, the nonmovant must "proffer countering evidence sufficient to create a genuine factual dispute" in order to avoid summary judgment. *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1562 (Fed.Cir.1987). The nonmovant may not rely upon its pleadings or conclusory allegations to demonstrate a factual dispute, but rather must set forth specific facts that establish an issue for trial, by affidavit or otherwise, such that the trier of fact could reasonably find in the nonmovant's favor. *Bromley Contracting Co. v. United States,* 15 Cl.Ct. 100, 105 (1988).

When considering cross-motions for summary judgment, the Court may not grant summary judgment in favor of either party if disputes remain concerning material facts. *Mingus Constructors Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.*

**II. Defendant May Properly Assert the Defense of Accord and Satisfaction in Opposition to Plaintiff First Bank's Motion for Partial Summary Judgment and in Support of Defendant's Cross–Motion for Summary Judgment**

As part of its argument that the existing law of the case establishes defendant's liabili-

ty to First Bank, plaintiff asserts that Judge Horn's decision in *Holland I* precludes defendant from raising the defense of accord and satisfaction against First Bank. *See* Pl.'s Reply at 3–5. Plaintiff relies largely upon *Hansen Bancorp, Inc. v. United States,* 67 Fed.Cl. 411 (2005), in which the court rejected defendant's effort to revive a liability defense asserted in an early pleading after a liability determination, damages trial, appeal, and remand on a damages issue. *See Hansen Bancorp,* 67 Fed.Cl. at 421–22; Pl.'s Reply at 3–4. Defendant responds that even if the law of the case doctrine is applicable here, it should not bar the Government's defenses "because to do so would be clearly erroneous and would work a manifest injustice" given the fact that "this Court did not consider the defenses that [defendant] now present[s], including those based upon the accord and satisfaction clause." Def.'s Reply at 22.

More pertinent than *Hansen* to the issue of waiver of affirmative defenses in this case are two opinions of the Federal Circuit, both in the patent context, stating the proposition that affirmative defenses are waived or abandoned if a defendant does not assert them in response to a summary judgment motion. In *Pandrol USA, LP v. Airboss Railway Products,* 320 F.3d 1354 (Fed.Cir.2003), the Court determined that defendant waived a defense to liability when it did not raise the defense in its response to plaintiff's motion for summary judgment. *Pandrol,* 320 F.3d at 1367–68. The *Pandrol* court relied on another patent case, *Diversey Lever, Inc. v. Ecolab, Inc.,* 191 F.3d 1350 (Fed.Cir.1999), in which the court stated that "an affirmative defense must be raised in response to a summary judgment motion, or it is waived." *Diversey,* 191 F.3d at 1353 (citing *United Mine Workers of Am.1974 Pension v. Pittston Co.,* 984 F.2d 469, 478 (D.C.Cir.1993) (hereinafter *"Pittston"*)); *see Pandrol,* 320 F.3d at 1366. The Court must therefore determine the applicability of this *Pandrol–Diversey* rule to defendant's accord and satisfaction defense.

■ The facts of the *Pandrol* case indicate that, as in this case, the defendants included

the affirmative defense at issue in their answer to the complaint. *See Pandrol,* 320 F.3d at 1366. The Court therefore reads *Pandrol* to provide that, in the Federal Circuit, assertion of an affirmative defense in a responsive pleading is not alone sufficient to save the defense from waiver or abandonment if the defense is not subsequently argued in opposition to a successful summary judgment motion on the issue of liability.[7]

■ The Court concludes that this case is nonetheless distinguishable from *Pandrol.* There, defendant argued that the issue of liability (including affirmative defenses) was not decided as to several of the defendants because plaintiffs' motion for summary judgment "failed to separately discuss the infringement liability of defendants other than Airboss Railway Products, Inc. or offer specific evidence as to the liability of each defendant." *Id.* at 1366. The court rejected the argument because "plaintiffs' motion specifically sought a finding of infringement *as to all defendants....*" *Id.* (emphasis added). By contrast, in this case no party has heretofore moved for, or been granted, a judgment of defendant's liability *as to all plaintiffs.* In *Holland I,* Judge Horn granted the cross-motion of plaintiffs Holland and Ross for partial summary as to liability for defendant's breach of contract relating to the Galva, Home, and Mutual acquisitions and to the Republic acquisition *as to Messrs. Holland and Ross. See Holland I,* 57 Fed.Cl. at 570. The finding of *liability* to those plaintiffs still stands. First Bank was not a party to the case at the time of Judge Horn's decision. Prior to its filing of the instant motion, First Bank has not sought, nor has the Court

made, a finding that the Government is liable to First Bank.

Not only does the absence of a determination that defendant is liable to First Bank serve to distinguish this case from *Pandrol,* but it also takes this case beyond the reach of the reasoning that ultimately underlies the *Pandrol–Diversey* rule. The *Diversey* court relied primarily on *Pittston,* in which the D.C. Circuit stated that "[a]s a general rule ... the failure to raise an affirmative defense in opposition to a motion for summary judgment constitutes an abandonment of the defense." *Pittston,* 984 F.2d at 478. *Pittston* in turn cited *Pantry, Inc. v. Stop–N–Go Foods, Inc.,* 796 F.Supp. 1164 (S.D.Ind.1992), in which a rationale for the rule is stated as follows:

> Whether a defense counters directly the elements of a claim or otherwise excuses liability (i.e. an affirmative defense), it must be presented and supported when *the embracing issue of "liability"* is considered for judgment. A *summary judgment on the issue of liability* encompasses all affirmative defenses and implicitly challenges the non-movant to establish a basis for finding that the defenses are both applicable and supported by the [sic] sufficient facts.

796 F.Supp. at 1167 (emphasis added). The court went on to state that "a defendant must *support* its affirmative defenses in response to a plaintiff's motion for summary judgment" and that it knew "of no authority for holding that affirmative defenses are somehow latent and survive a partial summary judgment to be argued at trial—even though the complete issue of liability has been determined."[8] *Id.* at 1167–68.

---

7. However, in *Daingerfield Island Protective Soc. v. Babbitt,* 40 F.3d 442 (D.C.Cir.1994), the D.C. Circuit distinguished its opinion in *Pittston* (upon which the Federal Circuit principally relied in *Diversey* ) on the basis that the defendant in *Pittston* had not included its affirmative defenses in any of its pleadings or motions, concluding that in the *Daingerfield* case "the government adequately raised the limitations defense in its answer—it was not required to reassert the defense in its subsequent successful [but later reversed] summary judgment motion." *Daingerfield,* 40 F.3d at 445. In *Daingerfield* plaintiff argued that defendant waived the defense by failing to raise it

in support of defendant's *own* summary judgment motion.

The Court also proceeds under the assumption that the Federal Circuit intended the rule enunciated in *Pandrol* and *Diversey* to apply outside of the patent context. This assumption gains some support from the fact that *Pittston* was not a patent case, but rather involved a pension trust. *See Pittston,* 984 F.2d at 471.

8. Another district court expressly disagreed with the *Pantry* court. In *Cytec Industries, Inc. v. B.F. Goodrich Co.,* 232 F.Supp.2d 821 (S.D.Ohio 2002), the court rejected the notion that an affirmative defense that is asserted in a defendant's

Here, in the words of *Pantry,* summary judgment has been granted on the "embracing issue" of defendant's liability *to plaintiffs Holland and Ross.* Judge Horn's ruling in *Holland I* remains the law of this case regarding defendant's liability to Holland and Ross, although the practical value of that determination to those plaintiffs has been diminished by this Court's subsequent determination that, despite the fact that Holland and Ross were parties to the contracts at issue and therefore had a claim for breach of those contracts, the damages they sought were recoverable not by them individually but by the corporate entities. *See Holland II,* 59 Fed.Cl. at 738–41; *Holland IV,* 63 Fed.Cl. at 149–50. Judge Horn's ruling also establishes that First Bank has made a *prima facie* case for breach of contract by defendant (based upon the same conduct of defendant, as to the same contracts, which formed the basis of Judge Horn's finding of breach as to plaintiffs Holland and Ross in her opinion in *Holland I* ). What has *not* been decided, as to First Bank, is the "embracing issue" of defendant's *liability.* That very issue is presently before the Court for the first time. Although defendant could have argued before Judge Horn that the 1991 Settlement Agreement constituted an accord and satisfaction of the claims of Holland and Ross (because Holland and Ross were signatories to it), that does not mean that the *Holland I* opinion precludes the

Government from asserting, as to First Bank, a defense the merits of which were never put before the *Holland I* court.

The pending motions put the issue of defendant's liability to plaintiff First Bank before the Court for the first time. Accordingly, defendant is entitled to assert the affirmative defense of accord and satisfaction against First Bank's motion for partial summary judgment and in support of its cross-motion for summary judgment. Defendant has preserved that defense, in accordance with RCFC 8(c), by including it in its answer to the complaint and its answers to the amended complaints.

**III. Although the Settlement Agreement Demonstrates Each of the Elements of a Valid Accord and Satisfaction of the Executory and Forbearance Promises, Plaintiff First Bank's Express Contract Claims Are Not Barred by the Settlement Agreement Because the Agreement Did Not Discharge the Contractual Liability of the Office of Thrift Supervision**

**A. The Settlement Agreement Demonstrates Each of the Elements of a Valid Accord and Satisfaction of the Executory and Forbearance Promises**

■ A "settlement agreement is a contract ... and its interpretation is a matter of law."

answer is waived if it is not argued or supported in response to a summary judgment motion, stating that "[t]he reasoning of the *Pantry* court is not supported by any provision of the Federal Rules of Civil Procedure nor any case law." *Cytec,* 232 F.Supp.2d at 829. The *Cytec* court supported its position with language from an earlier decision of the same district court that held that a plaintiff could not challenge a defendant's affirmative defenses for the first time in plaintiff's reply brief supporting the summary judgment motion:

In the context of summary judgment, it is well settled that the moving party *always* bears the initial responsibility of informing the district court of the basis for its motion. This initial burden remains with the moving party, even when the issue involved is one on which the non-movant will bear the burden of proof at trial, such as the Defendant's affirmative defenses in the present case. Given the Plaintiff's failure to address the Defendant's affirmative defenses in its initial summary judgment

Memorandum, *the Defendant had no obligation in its opposing Memorandum to demonstrate a genuine issue of material fact with respect to those defenses ....* Regardless of the Court's ruling on the Plaintiff's Motion, those affirmative defenses will remain viable in this litigation, as the Plaintiff has not properly moved for summary judgment on them.

*Id.* at 829 (quoting *Books–A–Million, Inc. v. H & N Enters., Inc.,* 140 F.Supp.2d 846, 851 (S.D.Ohio 2001)). This language is directly at odds with the *Pantry* court's assertion that a motion for summary judgment on liability implicitly challenges a non-movant to establish all of its defenses, including those not directly challenged by the movant in its motion. It appears that this Court is presently bound to follow *Pandrol, Diversey,* and by implication *Pantry,* rather than *Cytec.* As discussed in the accompanying text, the Court nonetheless concludes that the *Pandrol–Diversey* rule does not preclude defendant from asserting its accord and satisfaction defense in this case.

*Mays v. United States Postal Serv.*, 995 F.2d 1056, 1059 (Fed.Cir.1993) (citing *Greco v. Dept. of the Army*, 852 F.2d 558, 560 (Fed. Cir.1988)). "When construing a contract, a court first examines the plain meaning of its express terms." *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1375 (Fed.Cir. 2004) (citing *Textron Def. Sys. v. Widnall*, 143 F.3d 1465, 1468 (Fed.Cir.1998)). "If the terms of a contract are clear and unambiguous, they must be given their plain meaning—extrinsic evidence is inadmissible to interpret them." *Id.* (citing *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed.Cir.1996)). "A contract provision is only ambiguous if susceptible to more than one reasonable meaning." *Id.* at 1375–76 (citing *Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed.Cir.1986)). A contract is not rendered ambiguous merely because the parties disagree as to the meaning of its provisions. *See Brunswick Corp. v. United States*, 951 F.2d 334, 337 (Fed.Cir. 1991); *Blake Constr. Co. v. United States*, 220 Ct.Cl. 56, 60 n. 16, 597 F.2d 1357, 1359 n. 16 (1979).

"Contract interpretation is a question of law generally amenable to summary judgment." *Varilease Tech. Group, Inc. v. United States*, 289 F.3d 795, 798 (Fed.Cir. 2002) (citing *Textron*, 143 F.3d at 1468). The parties in this case contest the proper interpretation of the Settlement Agreement, not its existence or facts material to its interpretation. There exist no genuine issues of fact that are material to the Court's interpretation of the Settlement Agreement as a matter of law. Therefore the Court may properly adjudicate defendant's accord and satisfaction defense at the summary judgment stage.

■■■ An accord and satisfaction occurs when "some performance different from that which was claimed as due is rendered and such substituted performance is accepted by the claimant as full satisfaction of his claim." *O'Connor*, 308 F.3d at 1240 (quoting *Case, Inc. v. United States*, 88 F.3d 1004, 1011 n. 7 (Fed.Cir.1996)). A valid accord and satisfaction consists of four elements: (1) proper subject matter; (2) competent parties; (3) a meeting of the minds of the parties; and (4) consideration. *Id.* Accord and satisfaction is an affirmative defense, upon which defendant has the burden of persuasion. *See O'Conner v. United States*, 60 Fed.Cl. 164, 168 (2004).

As with many contemporaneous supervisory mergers, the Assistance Agreements required FSLIC "to provide continuing financial assistance to the acquiring thrifts, including coverage for capital losses on certain troubled assets, and indemnification from liabilities of the acquired thrifts accrued prior to the acquisitions." Pl.'s Reply at 8. (These promises are referred to as "executory payment" requirements or "executory promises.") Plaintiff contends that "[t]he express terms of the 1991 Agreement demonstrate the parties' intent to settle and terminate these [executory] payment promises only—not the regulatory capital forbearance promises the government made to Holland, Ross, and River Valley" that form the basis of plaintiff's breach claims ("forbearance promises").[9] Pl.'s Reply at 9. De-

---

9. In *Statesman Savings Holding Corp. v. United States*, 41 Fed.Cl. 1 (1998), the court summarized the distinction between the types of promises at issue here:

> The prior decisions discussing the termination of assistance agreements distinguish between two discrete aspects to the promises made by the Government: 1) regulatory forbearances, including the ability to amortize supervisory goodwill over a period of years; and 2) executory promises through which the Government obligated itself to provide certain forms of financial assistance to the financial institutions. Because the two types of promises are separate ... the termination of one does not necessarily affect the existence of the other.

*Statesman*, 41 Fed.Cl. at 7. The court continued: "FIRREA rescinded the ability of certain finan-

cial institutions to apply supervisory goodwill toward their capital requirements.... What FIRREA did not accomplish was the discharge of financial obligations owed by the FDIC to several financial institutions pursuant to the assistance agreements." *Id.* at 8. (In this case, the regulatory forbearance promises specifically included the ability of River Valley I and II to count the FSLIC cash contributions and the subordinated debentures toward their regulatory capital.) In order to alleviate the cost and administrative burden of continuing with its executory obligations, FDIC established a practice of entering into agreements by which it terminated the assistance agreements and settled its outstanding executory obligations by making a single, negotiated lump-sum payment to the thrifts. *See id.* The

fendant argues that Section 5 of the Settlement Agreement mutually released all claims related to the Assistance Agreements, *i.e.*, in addition to settling the executory payment requirements as set forth in Sections 1(a) and 1(b) of the Settlement Agreement, Section 5 further waived any other claim connected with the Assistance Agreements, including claims arising out of the breach of the forbearance promises. *See* Def.'s Resp. at 29–30; Def.'s Reply at 2–16.

The Court will analyze the scope of the accord and satisfaction effected by the Settlement Agreement in light of the four elements of an accord and satisfaction. The only element of the four that is uncontested is that of proper subject matter. The parties appear to agree that the breach claims in this case could have been a proper subject of the Accord and Satisfaction clause. As set forth below, the parties contest, either directly or implicitly, the other three elements as they relate to the proper construction of the Settlement Agreement.

### 1. The FDIC As Manager of the FRF Was a Competent Party to Accept a Discharge of the Breach Claim

■ Plaintiff argues that FDIC, as manager of the FRF, was not a competent party to accept a discharge of the breach claims presented in this case. Plaintiff maintains that the FDIC (as FRF-manager) "is not the government party responsible for the regulatory capital promises or their breach." Pl.'s Reply at 10. Rather, First Bank asserts that a release of the Office of Thrift Supervision ("OTS," successor to FHLBB) is indispensable to a discharge of such claims. *See id.* According to plaintiff, a "release of the 'FDIC as manager of the FRF' does not release the 'OTS,' or 'the United States,' or even the 'FDIC'; it is not sufficient to discharge Defendant from liability for the breaches of contract alleged here." *Id.* at 10–11.

Plaintiff's argument does not address the issue whether FDIC as manager of the FRF was a competent party. Rather, it is directed to the question whether the Accord and Satisfaction clause did, in fact, release OTS or the United States from liability. *See infra* Section III.B. As defendant notes, this court has stated that "[i]n its capacity as manager of the FRF, the FDIC is considered an agency of the United States." *Statesman Savings Holding Corp. v. United States*, 41 Fed.Cl. 1, 13 (1998). The FDIC manages the FRF in its corporate capacity. *Bailey v. United States*, 53 Fed.Cl. 251, 254 (2002). "When acting in its corporate capacity, the FDIC is an agency of the United States." *Perpetual Fin. Corp. v. United States*, 61 Fed.Cl. 126, 145 (2004) (citing *Statesman*, 41 Fed.Cl. at 13); *see FDIC v. Bank One, Waukesha*, 881 F.2d 390, 392 (7th Cir.1989); *FDIC v. Petersen*, 770 F.2d 141, 143 (10th Cir.1985).

That the FDIC had authority to act as an agency of the United States when it executed the Settlement Agreement is also reflected in the terms of the Assistance Agreements. FSLIC signed the Assistance Agreements on behalf of the Government as "a corporate instrumentality and agency of the United States." JA 4309, 4806. The recitals of the Settlement Agreement make clear that FDIC executed the agreement as FSLIC's successor: "The Assistance Agreements and the rights and obligations of the FSLIC thereunder were transferred to the FRF pursuant to section 11A(a)(2) of the [Federal Deposit Insurance] Act." Def.'s Supp.App., Ex. 3 at 2, Recital D. This court's precedents, combined with the fact that the FDIC acted as an agency of the Government in executing the Assistance Agreements, make clear that the FDIC was authorized to and did act as an agency of the United States, and therefore would be a competent party to accept a discharge of the breach claim in the event the Court were to determine that the Accord and Satisfaction clause did, in fact, discharge the United States from liability for the breach.

### 2. The Language of the Accord and Satisfaction Clause Was Sufficiently Broad to Extend to the Forbearance Promises As Well As the Executory Promises

It is clear that a central purpose of the Settlement Agreement was to fully satisfy

Settlement Agreement in this case was executed in the context of this general FDIC practice.

and discharge the outstanding executory payment requirements and any obligations or liabilities arising from those requirements. Indeed, in the parties' December 31, 2003, Joint Stipulation of Facts ("JSF," docket entry 119) the parties stipulated that "[o]n August 14, 1991, FDIC paid River Valley FSB $3.3 million to settle the executory payment provisions of the three Assistance Agreements." JSF ¶ 294. The issue is whether the Settlement Agreement, and in particular the Accord and Satisfaction clause at Section 5 of the agreement, was sufficiently broad to extend to the forbearance promises as well.

As plaintiff notes, the Federal Circuit in the *Winstar* case held that when agreements akin to the Assistance Agreements in this case expire by their own terms, only the executory promises, and not the forbearance promises, end with the agreements. *See Winstar Corp. v. United States*, 64 F.3d 1531, 1542 (Fed.Cir.1995) (en banc). Breach claims arising from the enactment of FIRREA survive such an expiration. Subsequently, in *Statesman*, Judge Christine O.C. Miller found that a "Termination Agreement," made in the context outlined in the preceding paragraph, did not reflect a meeting of the minds as to the settlement of "goodwill claims." *Statesman*, 41 Fed.Cl. at 9. In *Statesman*, as here, the FDIC agreed to make a lump sum payment in order to end its assistance obligations under the assistance agreement. *See id.* at 5. However, the Termination Agreement apparently did not contain a provision comparable to the Accord and Satisfaction clause of the Settlement Agreement in this case. Rather, "[a]s evidence that the Termination Agreement constitute[d] an accord and satisfaction of any and all claims arising out of the Assistance Agreement, defendant point[ed] to the language of the [Resolution Trust Corporation's] approval resolution" for the Termination Agreement. *Id.* at 6. The resolution stated that the lump sum payment was made "in exchange for the early termination and satisfaction of the FSLIC Assistance Agreement" and that the Resolution Trust Corporation's [the "RTC's"] Board of Directors approved "the early termination and satisfaction of the Statesman Assistance Agreement.... " *Id.* The court rejected defendant's argument

that the Termination Agreement was "devoid of ambiguity, in that to understand the agreement—and the scope of the alleged accord and satisfaction—the court must understand the context in which it was entered." *Id.* The court determined that the parties did not intend to settle any obligations other than the executory payment requirements in light of the FDIC's policy of settling its executory obligations by making lump sum payments, and because the underlying documentation revealed that the $28 million lump sum payment corresponded to FDIC's executory payments. *See id.* at 9. "Because defendant failed to put forth credible evidence indicating that the parties intended to effectuate a global release," the court found that defendant had failed to establish an accord and satisfaction of plaintiff's breach claims. *Id.*

The Accord and Satisfaction clause, however, differentiates these Assistance Agreements from the contract in *Statesman*. The clause provides:

> *Except as otherwise specifically provided herein*, performance by each party of its respective obligations under this Settlement Agreement shall effect a complete accord and satisfaction of *any and all obligations and liabilities of such party under the Assistance Agreements* and, thenceforth, such party shall be fully discharged from *any obligation or liability of any kind in connection therewith*, including, without limitation, any and all actions, causes of action, suits, debts, sums of money, bonds, covenants, agreements, promises, damages, judgments, claims, and demands whatsoever, known or unknown, suspected or unsuspected, at law or in equity.

Def.'s Supp.App., Ex. 3, § 5 (emphasis added). Even considering that the Settlement Agreement arose in the context of the same general FDIC practice as the Termination Agreement in *Statesman*, the presence of such broad and (according to both parties) unambiguous "accord and satisfaction" language limits the usefulness of *Statesman* in construing the Settlement Agreement as it pertains to plaintiff's breach claims. Rather, the Federal Circuit's *en banc* decision in

*Winstar* and the decision in *Statesman* establish merely that, absent the Accord and Satisfaction clause, claims for a pre-existing breach of contract would have survived the expiration or termination of the Assistance Agreements.

To begin, both parties argue that the Settlement Agreement unambiguously supports their respective positions by its own terms. *See* Def.'s Resp. at 28–36; Pl.'s Reply at 8–12; Def.'s Reply at 1–16. Plaintiff argues that those terms "demonstrate the parties' intent to settle and terminate" only the executory promises and not the forbearance promises. Pl.'s Reply at 9. Plaintiff first emphasizes Section 1(b) of the Settlement Agreement, which provides that the $3,276,902.90 payment by FDIC to River Valley

> shall constitute full satisfaction of any and all remaining payments or contributions due or to become due under the Assistance Agreements, and shall fully discharge the Manager and the FRF from any obligation or liability in connection therewith, including, without limitation, any obligation or liability with respect to (I) payments for capital losses, (ii) indemnifications for undisclosed liabilities, unreserved for claims, challenges to the transaction, and related claims, and (iii) claims for accrued but uncollected interest.

Def. Supp.App., Ex. 3, § 1(b); Pl.'s Reply at 9. Plaintiff also cites the corresponding language in Section 1(a) regarding the satisfaction of River Valley's obligation to share certain tax benefits under the Peoria Agreement. Pl.'s Reply at 9. Plaintiff next states that the above provisions of Section 1 "are the exclusive expression of consideration exchanged by the parties" and that nowhere in the accord and satisfaction clause or elsewhere in the Settlement Agreement "is there *any* mention of the government's regulatory capital promises, nor any discussion of any additional consideration that might be thought to compromise a claim for the breach of those valuable promises."[10] *Id.* at 9–10.

On these bases, plaintiff concludes that "read in the context of the entire contract, as it must be, the accord and satisfaction clause *simply refers* to the essential exchange in Section 1—*echoing* that provision's mutual release by each party from 'any obligation or liability' 'in connection with the Assistance Agreement.'" *Id.* at 10 (emphasis added) (footnotes omitted).

It is "one of the cardinal principles of contract interpretation, that an interpretation which gives reasonable meaning to all parts of an instrument is preferred to one which leaves a portion of it useless, inoperative, void, meaningless, or superfluous." *Blake Constr. Co. v. United States*, 220 Ct.Cl. 56, 60, 597 F.2d 1357, 1359 (1979); *accord Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 395, 351 F.2d 972, 979 (1965). "Such interpretation must assure that no contract provision is made inconsistent, superfluous, or redundant." *Lockheed Martin IR Imaging Sys. v. West*, 108 F.3d 319, 322 (Fed.Cir.1997) (citing *McAbee Const., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed.Cir. 1996)). Plaintiff essentially asks the Court to conclude that "full satisfaction of *any and all remaining payments or contributions* due or to become due under the Assistance Agreements" and full discharge "from any obligation or liability in connection therewith" (Section 1(b)) have precisely the same meaning as "complete accord and satisfaction of *any and all obligations and liabilities of such parties under the Assistance Agreements*" and full discharge of "any obligation or liability *of any kind* in connection therewith" (Section 5) (emphasis added). Plaintiff's argument that the Accord and Satisfaction clause merely "echo[es]" the discharge, in Section 1 of the Settlement Agreement, of obligations and liabilities in connection with the executory obligations is an assertion that the clause itself adds nothing to the agreement and is therefore superfluous and redundant. Although this fact alone does not conclusively establish that plaintiff's construction

---

10. This Section III.A.2. addresses, *infra* at 243, plaintiff's argument that the consideration for the Settlement Agreement indicates that the language of the Accord and Satisfaction clause did not extend to the forbearance promises. The Court addresses plaintiff's argument that defendant's interpretation of the Accord and Satisfaction clause would fail for lack of consideration in Section III.A.3., *infra*.

is incorrect, it represents a disfavored interpretation.

Defendant argues that the Accord and Satisfaction clause "covers virtually the entire universe of claims a party to the Settlement Agreement could ever hope to bring regarding the River Valley I or River Valley II assistance agreements." Def.'s Resp. at 30. Defendant cites the broad terms of the Accord and Satisfaction clause (*"complete* accord and satisfaction of *any and all* obligations and liabilities of such party under the Assistance Agreements"; each party "shall be *fully* discharged from *any* obligation or liability of *any kind* "; *"any and all actions, causes of action, suits,* debts, sums of money, bonds, covenants, agreements, promises, *damages, judgments, claims,* and demands *whatsoever* ") in support of its interpretation that the Accord and Satisfaction clause applies to all claims, including those for breach of the forbearance promises. *Id.* (quoting Def. Supp.App., Ex. 3, § 5) (emphasis in original). Defendant characterizes plaintiff's argument that the Accord and Satisfaction clause did not encompass its breach claims because the Settlement Agreement did not even mention the forbearance promises as "backwards." Def.'s Reply at 5. According to defendant, where the settlement language indicates that the parties have settled "any and all" claims, the relevant question is not whether the parties specifically included breach claims within the settlement, but rather whether the parties expressly reserved or excepted such claims from the settlement. *See* Def.'s Reply at 3–6. In response to plaintiff's argument regarding the lack of additional consideration for the release of breach claims (in the meeting of the minds context), defendant notes that "First Bank does not even suggest what *should* be consideration for a party to forsake the right to bring what was then an inchoate claim that would not be filed" until four years later. Def.'s Reply at 14.

In *Augustine Medical Inc. v. Progressive Dynamics,* 194 F.3d 1367 (Fed.Cir.1999), the Federal Circuit construed a settlement agreement which contained very broad general release language "such as 'release and forever discharge,' 'any and all manner of action or actions,' 'relating to any acts, omissions or statements made by Progressive,' and 'including, but not limited to, any and all claims that were or could have been asserted by AMI in the [present lawsuit].' " *Augustine Medical,* 194 F.3d at 1372 (alteration in original). The court stated that "[g]eneral language such as these phrases have consistently been held by the courts to constitute a waiver of all claims and causes of action 'arising under or by virtue of the contract,' and of all 'claims based upon events occurring prior to the date of release.' " *Id.* (quoting *United States v. William Cramp & Sons Ship & Engine Bldg. Co.,* 206 U.S. 118, 128, 42 Ct.Cl. 532, 27 S.Ct. 676, 51 L.Ed. 983 (1907) and *Johnson, Drake, & Piper, Inc. v. United States,* 209 Ct.Cl. 313, 531 F.2d 1037, 1047 (1976)) (internal citations omitted). In *William Cramp,* a shipbuilding contractor agreed to release and discharge the Government "of and from all and all manner of debts, dues, sum and sums of money, accounts, reckonings, claims and demands whatsoever, in law or in equity, for or by reason of or on account of the construction of said vessel under the contract aforesaid." *William Cramp,* 206 U.S. at 121, 27 S.Ct. 676. Rejecting the contractor's argument that the release applied only to "claims springing out of the construction of the vessel," *id.* at 122, 27 S.Ct. 676, the Supreme Court stated that "[s]tipulations of this kind are not to be shorn of their efficiency by any narrow, technical, and close construction. The general language 'all and all manner of debts,' etc. indicates an intent to make an ending of every matter arising under or by virtue of the contract." *Id.* at 128, 27 S.Ct. 676.

Here, as in *Augustine* and *William Cramp,* the parties used patently broad and encompassing language to define the scope of the Accord and Satisfaction clause, and the Court ought not to add qualifications or restrictions to that language nor labor to find a technical construction that would alter its plain meaning. The terms "any obligation or liability of any kind in connection [with the Assistance Agreements]" and "any and all actions, causes of action, suits, … promises, damages, judgments, claims … whatsoever, known or unknown, suspected or unsuspect-

ed, at law or in equity" clearly encompass a claim for breach of the Assistance Agreements themselves or a breach "in connection" with the Assistance Agreements.

Defendant also cites *First Nationwide Bank v. United States,* 48 Fed.Cl. 248 (2000), one of a subset of the *Winstar*-related cases known as the "tax benefit" or "Guarini Legislation" cases, in which the court accepted, in part, defendant's accord and satisfaction defense. *See First Nationwide Bank,* 48 Fed. Cl. at 257. The nature of the release of claims in the *First Nationwide* settlement agreement was different from the Accord and Satisfaction clause here in that the parties expressly excepted breach of contract claims against the United States based upon enactment of the Guarini Legislation from the release (while including in the release claims of any kind based upon the conduct of the FDIC). *See id.* at 259. The case is, nonetheless, instructive here. For instance, the court stated:

> Even if, however, the United States may in this instance be sued on the basis of acts or omissions committed by the FDIC, plaintiffs in § 12.2 of the Settlement Agreement have released the FDIC, and, therefore, the United States, from and against "*any and all actions and causes of action* ... by reason of any act or omission whatsoever by [the FDIC] in connection with the Lawsuit, the Assistance Agreement, [or] the supervision of the FDIC ... with respect to the Covered Assets...." This release *includes theories of recovery based upon allegations that the FDIC breached the Assistance Agreement.* Because plaintiffs' first four initial theories are based upon such allegations, they are barred by § 12.2 of the Settlement Agreement.

*Id.* at 260 (emphasis added, alterations in original). Not unlike plaintiff here, the plaintiffs in *First Nationwide* attempted to avoid the broad language of the settlement by arguing that "any acts or omissions of the FDIC" referred only to certain lobbying activities connected with the Guarini Legislation. *Id.* In response to this argument, the court remarked, "There are perhaps few words in the English language as unambigu-

ous as the word 'any.' It is not 'susceptible of two different and reasonable interpretations.'" *Id.* at 261. The court determined that plaintiffs' theories of recovery based upon a breach of the assistance agreement by conduct of FDIC were barred by the settlement agreement. *See id.*

Again, the Court reads "any and all obligations and liabilities" under the Assistance Agreements and "any obligation or liability of any kind in connection therewith, including, without limitation, any and all actions, causes of action ... promises ... claims, and demands whatsoever" to be exactly that. The language of the Accord and Satisfaction clause plainly and unambiguously includes all claims, whether they result from a breach of the executory promises or a breach of the forbearance promises, so long as those claims are in connection with the Assistance Agreements.

■ To escape this result, plaintiff relies heavily on the fact that the Settlement Agreement does not specifically discharge or mention the forbearance promises. However, as the Federal Circuit has stated, "[c]onsistent also with judicial interpretations of general releases, it is the burden of the parties entering into a settlement agreement to expressly reserve in the agreement any rights that they wish to maintain beyond the date of the settlement of agreement." *Augustine,* 194 F.3d at 1373. "If parties intend to leave some things open and unsettled, their intent to do so should be made manifest." *William Cramp,* 206 U.S. at 128, 27 S.Ct. 676; *see also Merritt–Chapman & Scott Corp. v. United States,* 198 Ct.Cl. 223, 229, 458 F.2d 42, 45 (Ct.Cl.1972) (approving contract appeals board's statement that "[o]n a settlement of such broad scope as that contemplated by the contracting parties in this case, any reservation of particular items for future claim and payment should be clear and explicit...."). By contrast, such an explicit reservation was present in *Bluebonnet Savings Bank, F.S.B. v. United States,* 266 F.3d 1348 (Fed.Cir.2001), in which the Federal Circuit held that plaintiff's *Winstar*-type subordinated debt claim was not barred by an earlier settlement agreement because "[t]he settlement agreement's mutual release

excepted 'all claims of CFSB and Fail to the extent they relate to alleged breaches of contract relating to capital forbearances, dividend forbearances, and dividend payments, or takings arising from any of the foregoing.'" *Bluebonnet Savings Bank, F.S.B.,* 266 F.3d at 1355. The court concluded that "capital forbearances" included the subordinated debt forbearance, thereby excluding the claim from the settlement. *Id.* at 1355. A similar express reservation was present in another *Winstar*-related Guarini Legislation case, *Centex Corp. v. United States,* 395 F.3d 1283 (2005). In that case, the Termination Agreement contained a proviso stating:

> [T]he release provided in this Section 9.2: ... (iv) shall not operate in any way to limit the ability of CTX or Texas Trust to bring any claim against the United States or any agency or instrumentality thereof (other than the FDIC Manager) based on legislation that resulted in the reduction or elimination of contractual benefits with respect to the December 29, 1988 FSLIC (later, FRF) –assisted acquisition of substantially all of the assets and the secured and deposit liabilities of the Acquired Associations....

*Centex,* 395 F.3d at 1312. In light of the proviso, the Federal Circuit concluded that "the Termination Agreement cannot be interpreted as terminating the right to sue the United States when the agreement explicitly reserved that right." *Id.*

■ Given the broad language of the Settlement Agreement's Accord and Satisfaction clause, therefore, the relevant inquiry here is whether the agreement specifically *excluded* claims arising from the regulatory capital forbearance promises from the clause's reach. Indeed, this approach is consistent with the fact that the parties prefaced the clause with the words "[e]xcept as otherwise specifically provided herein." Def.'s Supp. App., Ex. 3, § 5. Plaintiff points to no provision of the Settlement Agreement that reserves claims for breach of the forbearance promises from the reach of the Accord and Satisfaction clause.

The Court is not swayed by plaintiff's argument that the monetary consideration exchanged in the Settlement Agreement demands a narrower interpretation of the Accord and Satisfaction clause. The *Statesman* court considered such an argument relevant in construing a Termination Agreement that it deemed to be ambiguous, observing that a worksheet accompanying an RTC memorandum revealed that calculation of the $28 million payment "correlated to the FDIC's executory payments." *Statesman,* 41 Fed.Cl. at 9. There was no other evidence that the parties intended to settle any other obligations. *Id.* Here, on the other hand, even assuming that the $3.3 million payment reflects only the value of the executory promises and that no further consideration is stated in the Settlement Agreement, the amount of consideration agreed upon by the parties does not justify an interpretation of the Accord and Satisfaction clause that excludes from its coverage particular types of claims that the clause's plain language clearly contemplates. (In any event, defendant correctly observes that plaintiff offers no guidance concerning what, in 1991, might have been appropriate consideration for discharge of the potential breach claims.) Furthermore, as discussed in Section III.A.3., *infra,* even if the monetary consideration was intended specifically as compensation for the release of the executory obligations, additional promises in the same Agreement (*e.g.,* the discharge of claims provided for in the Accord and Satisfaction clause) need not be supported by additional or separate consideration.

Finally, although the Court bases its conclusion on the unambiguous text of the Settlement Agreement and therefore considers the use of extrinsic evidence inappropriate in the construction of the Agreement, the Court notes that the extrinsic evidence proffered by plaintiff does little to support its position. First, plaintiff cites a status report to Congress for the month of August 1991 by the RTC (Pls.' Second Supp.App., Tab 4) stating that under the Settlement Agreement, "FDIC paid River Valley the net sum of $3,226,902.90 to fully discharge FRF's obligations to River Valley" achieving estimated cost savings of $165,000 before utilization of tax benefits. Pl.'s Reply at 13. Although

plaintiff makes much of the fact that the report does not mention the settlement of regulatory capital forbearance promises, consideration that might have been exchanged in satisfaction of such a settlement, or government cost savings directly attributable to settlement of breach claims, the report is unhelpful because of its generality and the fact that it does not discuss the intent of the Accord and Satisfaction clause at all.

Second, plaintiff refers to a July 25, 1991 RTC internal memorandum concerning the proposed early termination of the Assistance Agreements (Pls.' Second Supp.App., Tab 3). Plaintiff emphasizes that a "chart describing the 'accounting impact to the FRF' of the Settlement Agreement attributes *every dollar of consideration paid to River Valley in the settlement* to 'the FRF's projected liability to River Valley based on Loss Reserve estimates, as of March 31, 1991, prepared by RTC staff.'" Pl.'s Reply at 14. Plaintiff points out that the RTC memorandum does not specifically mention the forbearance promises and argues further that it does not "discuss any goal of settling potential breach of contract suits associated with those forbearances." *Id.* As defendant notes, however, the memorandum also indicates that the avoidance of the risk of litigation partly motivated FDIC to enter into the Settlement Agreement. *See* Def.'s Reply at 18. The memorandum states that "[a]lthough there are no existing Litigation claims, the potential of such claims remains present until the agreements terminate. It would be difficult at best to attempt quantify unknown claims at this time." Pls.' Second Supp.App., Tab 3 at 6–7. If the claims discharged by the Settlement Agreement correspond so precisely with the remaining executory obligations as plaintiff asserts, it is not altogether clear why those claims would be so difficult to quantify (other than, perhaps, the cost involved in litigating them). Indeed, the above-quoted language appears to indicate that by making a lump sum payment of $3.2 million in lieu of continuing with its executory obligations, the Government intended to dispense with all such unknown claims in connection with the Assistance Agreements, thereby contribut-

ing to "a reduction in the Government's total potential cost." *Id.* at 7.

Third, plaintiff cites an April 15, 1991 letter from Dr. Holland to RTC case manager Eric Fritz (Pls.' Second Supp.App., Tab 2) offering settlement of the Assistance Agreements and which plaintiff states "is limited to evaluating the FRF's liability to River Valley for indemnifications and covered asset losses" and does not mention or value claims for breach of the regulatory capital forbearance promises. Pl.'s Reply at 15. However, the letter begins by stating that River Valley has "analyzed the three (3) Agreements in order to assess all pending claims and propose a settlement of all claims, a termination of the Agreements and *release all claims arising under the Agreements* or claims which by their terms survive the termination of the Agreements." Pls.' Second Supp. App., Tab 2 at 1 (emphasis added). The letter concludes in the same manner. As with the language of the Accord and Satisfaction clause itself, plaintiff's emphasis on the fact that breach claims are not specifically mentioned is misplaced in the context of such broad language. The relevant inquiry is whether the breach claims have been specifically excluded from the settlement.

Finally, plaintiff cites a January 30, 2006 declaration by Dr. Holland (Pls.' Second Supp.App., Tab 5) which was filed concurrently with its February 6, 2006 reply brief and merely tracks the interpretation of the Settlement Agreement asserted by plaintiff therein. Even were the Court to consider the extrinsic evidence relied upon by plaintiff, at best, an examination of the extrinsic evidence reveals that it is ambiguous while the terms of the Settlement Agreement themselves are not.

As noted above, plaintiff's interpretation of the Accord and Satisfaction clause (that it merely "echo[ed]" the discharge of claims pertaining to the executory promises in Section 1 of the Settlement Agreement) would render the clause redundant when read in the context of the entire agreement. The unambiguous terms of the Accord and Satisfaction clause reach claims arising out of breach of the forbearance promises by the enactment and implementation of FIRREA. To the extent such claims arose in connection with the Assistance Agreements, they would

be within the scope of the Accord and Satisfaction.

Plaintiff further contends that the discharge of claims "in connection" with the Assistance Agreements does not encompass promises expressed in other documents that, together with the Assistance Agreements, comprise the contracts between plaintiff's predecessor-in-interest and the Government. *See* Pl.'s Reply at 10–11. Plaintiff asserts that the Accord and Satisfaction clause "does not refer to the FHLBB resolutions and forbearance letters that actually set forth the regulatory capital promises at issue in this case." *Id.* at 10.

Defendant responds first that plaintiff's argument in this regard directly conflicts with plaintiff's own theory of the case, which Judge Horn adopted in *Holland I,* that the Assistance Agreements, FHLBB resolutions, and forbearance letters together form the unitary agreements that comprise the River Valley I and River Valley II contracts. *See* Def.'s Reply at 6–7. Defendant further argues that plaintiff's argument is inconsistent with the terms of the Assistance Agreements because those agreements expressly incorporate the FHLBB resolutions and forbearance letters. *See id.* at 7. Defendant also takes issue with plaintiff's assertion that the resolutions and forbearance letters "actually set forth the regulatory capital promises," stating that the "vast majority" of those promises are contained in the Assistance Agreements themselves. *Id.* at 9–10 (citing to JA 4327, 4836–38). Defendant states that $1.3 million of recorded goodwill and $2 million of sub-debt issued in connection with the River Valley II transaction are the only regulatory capital promises not mentioned in the Assistance Agreements themselves. *Id.* at 10.

Additionally, in defendant's alternate arguments discussing plaintiff's extrinsic evidence, defendant quotes *Hopi Tribe v. United States,* 55 Fed.Cl. 81 (2002), in which the court noted, in the statutory construction context, that "[t]he Federal Circuit has held that the 'operative phrase "in connection with" is very sweeping in scope.'" *Hopi Tribe,* 55 Fed.Cl. at 101 (quoting *RAMCOR Servs. Group, Inc. v. United States,* 185 F.3d 1286, 1289 (Fed.Cir.1999)); Def.'s Reply at 19. Although the Court sees no reason why this rule of construction should not apply to the construction of a contract as well as a statute, as explained below an even narrower interpretation of the Settlement Agreement's discharge of claims "in connection" with the Assistance Agreements would support the conclusion that any claims arising out of the forbearance letters, resolutions, or the Assistance Agreements are precluded by that discharge.

The Assistance Agreements expressly incorporate the FHLBB resolutions and forbearance letters that plaintiff asserts form an alternate basis for its claims. Both the River Valley I and River Valley II Assistance Agreements contain an integration clause stating that each Assistance Agreement

> constitutes the entire agreement between the parties and supersedes all prior agreements and understandings of the parties in connection with it, *excepting only* the Merger Agreement and *any resolutions or letters concerning the Transaction or this Agreement issued by the Bank Board or the [FSLIC]* in connection with the approval of the Transaction and this Agreement. . . .

JA 4363–64 (River Valley II, § 23) (emphasis added); *see* JA 4884 (River Valley I, § 23). This language clearly incorporated FHLBB Resolutions 88–612 and 88–638 (which approved the execution of the River Valley II and River Valley I Assistance Agreements, respectively) and the related forbearance letters into each Assistance Agreement. Indeed, such a reading is consistent with the Supreme Court plurality's characterization of substantially identical integration clauses in the *Winstar* case. In *Winstar,* the Supervisory Action Agreement ("SAA") between Glendale and FSLIC contained an integration clause that provided, "This Agreement ... constitutes the entire agreement between the parties thereto and supersedes all prior agreements and understandings of the parties in connection herewith, excepting only the Agreement of Merger and any resolutions or letters issued contemporaneously herewith." *United States v. Winstar Corp.,* 518 U.S. 839, 862, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). The plurality stated that "[t]he SAA thereby incorporated Bank Board resolution No. 81–710, by which the Board had ratified the SAA." *Id.* Similarly, in the Winstar transaction, the parties "made

an Assistance Agreement that incorporated, by an integration clause much like Glendale's, both the Board's resolution approving the merger and a forbearance letter issued on the date of the agreement." *Id.* at 864, 116 S.Ct. 2432. Earlier in the same case, the Federal Circuit reached a similar conclusion: "We conclude based on all of the contemporaneous documents, which *under the integration clause* of the SAA collectively constituted *the 'Agreement'* of the parties, that the Bank Board and the FSLIC were contractually bound to recognize the supervisory goodwill and the amortization periods reflected in the approved accountants' letter." *Winstar,* 64 F.3d at 1541–42 (emphasis added). Likewise, the Assistance Agreements in this case by their terms included the resolutions and forbearance letters as part of the contractual agreement between the parties.[11]

As defendant notes, plaintiff itself has adopted this very theory of the case, asserting that the Assistance Agreements, FHLBB resolutions, and forbearance letters for each transaction were part of "a series of integrated documents which together comprise a unitary agreement," Third Am. Compl. ¶ 25, and "an integrated unitary contract." *Id.* ¶ 44. The *Winstar* cases and plaintiff's own allegations make clear that these documents together constitute but one contract for each

merger transaction. It is difficult to conceive how different parts of the same contract can be construed not to be "in connection" with each other. Thus, any claims arising out of the forbearance letters or FHLBB resolutions must be considered to be "in connection" with the Assistance Agreement. The Court, therefore, need not distinguish among forbearance promises contained in the Assistance Agreements themselves and those contained only within the resolutions and letters (although an examination of the record appears to support the accuracy of defendant's representations that $1.3 million of recorded goodwill and $2 million of sub-debt issued in connection with the River Valley II transaction are the only regulatory capital promises not expressly included in the Assistance Agreements themselves).

In view of the foregoing, the Court concludes that the language of the Accord and Satisfaction clause was sufficiently broad to extend to both the forbearance and the executory promises.[12]

### 3. There Was Sufficient Consideration to Support an Accord and Satisfaction of the Forbearance Promises

▮▮▮ To the extent that plaintiff's consideration-based arguments suggest that defen-

**11.** In *California Federal Bank, FSB v. United States,* 245 F.3d 1342 (Fed.Cir.2001), the Federal Circuit concluded that a *Winstar*-type contract can arise in the absence of an Assistance Agreement or SAA on the basis of other documents establishing an intent to contract, such as FHLBB resolutions and items of correspondence. *See Cal. Fed. Bank,* 245 F.3d at 1347. While this holding has no bearing on the Court's conclusion in this case that any claims arising out of the resolutions and letters are "in connection" with the Assistance Agreements, the trial court's opinion in *California Federal* described an argument of the plaintiff in that case that, in this Court's opinion, was somewhat inaccurate in describing the relationship between the SAAs or assistance agreements and the resolutions and letters: "In the *Winstar* and Southeastern transaction cases, the SAAs contained language that excepted merger agreements, Bank Board letters, and resolutions from the integration document, implying that these documents stood on their own as independently enforceable agreements." *Cal. Fed. Bank v. United States,* 39 Fed. Cl. 753, 774 (1997). The Federal Circuit did not address this statement. This Court reads the integration clauses (as did the Supreme Court

plurality and the Federal Circuit in *Winstar*) to incorporate the FHLBB resolutions and forbearance letters as part of the single integrated contractual agreement for each transaction. Even if the resolutions and forbearance letters would constitute independently enforceable contracts in the absence of an assistance agreement or SAA, the express relationship between them and the Assistance Agreements in this case clearly renders them "in connection" with the Assistance Agreements.

**12.** In support of its interpretation of the Settlement Agreement, plaintiff contrasts a release executed by Metropolitan Federal Bank of North Dakota in connection with a *Winstar*-claim settlement agreement, in which the bank released the Government

> of and from any and all manner of action and actions, cause and causes of action, suits, debts, accounts, promises, warranties, damages, claims, demands and liabilities of every kind or character … arising, in whole or in part, out of or in connection with the 1985 Agreements, the 1988 Agreements or the Forbearance Letters or any other agreements or

dant's interpretation of the Accord and Satisfaction clause would fail for lack of additional consideration (beyond the monetary consideration allegedly correlated to the discharge of the executory promises), these arguments also fail. In *First Nationwide*, in which (as discussed in Section III.A.2., *supra*) the court found that certain theories of recovery were precluded by an accord and satisfaction, the court also rejected plaintiff's argument "that there was no consideration given for their promise not to use the present theories" and "that separate consideration was required for the particular promises regarding the Excepted Claims...." *First Nationwide*, 48 Fed.Cl. at 261. Like the *First Nationwide* court, the Court notes the RESTATEMENT (SECOND) OF CONTRACTS:

> (1) There is consideration for a set of promises if what is bargained for and given in exchange would have been consideration for each promise in the set if exchanged for that promise alone.
>
> (2) The fact that part of what is bargained for would not have been consideration if that part alone had been bargained for does not prevent the whole from being consideration.

RESTATEMENT (SECOND) OF CONTRACTS § 80 (1981). Furthermore, "[s]ince consideration is not required to be adequate in value (*see* § 79), two or more promises may be binding even though made for the price of one. A single performance or return promise may thus furnish consideration for any number of promises." *Id.* § 80 cmt. a. The *First Nationwide* court concluded that "[t]he $13,162,931 sum provided for in § 2.1 of the Settlement Agreement supports all of the promises plaintiffs made in the Settlement Agreement. When payment was made, the accord represented by the Settlement Agreement was satisfied." *First Nationwide*, 48 Fed.Cl. at 261.

In this case, the consideration stated in Section 1 of the Settlement Agreement supported all of the promises made in the agreement, including the promises by each party to discharge any and all claims in connection with the Assistance Agreement. When the parties made the payments required by Section 1 of the Settlement Agreement (the remittance of such payments being uncontested by the parties), "the accord represented by the Settlement Agreement was satisfied." *Id.* That accord included within its scope claims arising out of the breach of the forbearance promises by the Government's enactment and implementation of FIRREA. Defendant's (and the Court's) interpretation of the Accord and Satisfaction clause does not cause it to fail for lack of consideration. Consequently, there was sufficient consideration to support an accord and satisfaction of the forbearance promises.

**B. Defendant's Accord and Satisfaction Defense Fails Because FHLBB Was a Party to the Forbearance Promises, OTS Succeeded to FHLBB's Contractual Obligations, and the Settlement Agreement Did Not Purport to Discharge Claims Against Government Agencies Other Than the FDIC, As Manager of the FRF**

█ The parties to the Settlement Agreement were the FDIC, in its capacity as man-

documents related thereto (other than the Capital Maintenance Agreement).... Pls.' Second Supp.App., Tab 1 at MSJ 0037; Pl.'s Reply at 11–12. Plaintiff suggests that such a release would effect an accord and satisfaction of the scope contended for by defendant here. The trial court in *Statesman* made a similar suggestion about the Metropolitan release in the last sentence of a footnote. *See Statesman*, 41 Fed Cl. at 9 n. 7. However, plaintiff offers no reason why the enumeration of the agreements and forbearance letters is required, or is superior to the language of general release employed in the Settlement Agreement here, in effecting a release of forbearance-related breach claims. Moreover, as defendant points out, it was necessary for Metropolitan Federal Bank to specifically enumerate the forbearance letters because, unlike the Settle-

ment Agreement in this case, the Termination Agreement to which the release related expressly excluded the forbearance letters from the definition of the "1988 Agreements." *See* Pls.' Second Supp.App., Tab 1 at MSJ 0005–06; Def.'s Reply at 8. Here, the Assistance Agreements incorporated the FHLBB resolutions and forbearance letters, and the Settlement Agreement did not exclude them. Furthermore, as in this case, the Metropolitan Federal release does not appear to differentiate between claims arising from the executory promises and those arising from breaches of the forbearance promises. Rather, much like the Settlement Agreement, it releases "any and all manner of action and actions" and "liabilities of every kind and character" in connection with the agreements and forbearance letters.

ager of the FRF, River Valley III, Homer J. Holland, and Howard R. Ross. Def.'s Supp. App., Ex. 3 at 1. The FDIC in its capacity as manager of the FRF, is the only governmental signatory to the agreement (except for a "concurrence" by the RTC, which is not a party to the agreement). *See id.* at 21. The Accord and Satisfaction clause states that upon "performance by each party of its respective obligations" under the Settlement Agreement "such party shall be fully discharged from any obligation or liability of any kind in connection with" the Assistance Agreements. *Id.* § 5. Plaintiff argues that the Settlement Agreement's release of claims against the FDIC, as manager of the FRF, did not discharge the breach claims against the United States presented in this case because other government entities were contractually liable for the breach. That is, even though the Settlement Agreement's Accord and Satisfaction clause would discharge claims for breach of the forbearance promises as between the parties to the agreement, plaintiff asserts that a discharge of FDIC as manager of the FRF does not constitute a discharge of such breach claims against the United States.[13] Rather, plaintiff maintains that the FDIC (as FRF-manager) "is not the government party responsible for the regulatory capital promises or their breach." Pl.'s Reply at 10. Instead, First Bank asserts, a release of the OTS is indispensable to a discharge of such claims. *See id.* According to plaintiff, a "release of the 'FDIC as manager of the FRF'' does not release the 'OTS,' or 'the United States,' or even the 'FDIC'; it is not sufficient to discharge Defendant from liability for the breaches of contract alleged here." *Id.* at 10–11.

Although defendant is correct that the FDIC, as manager of the FRF, is an agency of the United States and would be a competent party to enter into a settlement agree-

ment on behalf of the Government, *see supra* Section III.A. 1., this fact alone is insufficient for defendant to prevail on the question whether the Settlement Agreement in fact released all potential claims against the United States. Defendant must also prove that the FDIC and plaintiff's predecessors-in-interest intended the Settlement Agreement's terms to apply to the United States (and therefore all of its agencies), and not merely to the FDIC as manager of the FRF. However, it is clear from the language of the of the Settlement Agreement that its terms apply only to the FDIC, in its capacity as manager of the FRF, and not to the United States generally. As noted above, the only named governmental party to the agreement is "the FEDERAL DEPOSIT INSURANCE CORPORATION (the 'FDIC'), in its capacity as manager of the FSLIC Resolution Fund (the 'FRF')...." Def.'s Supp.App., Ex. 3 at 1. The Settlement Agreement throughout refers to FDIC, as manager of the FRF, as the "Manager." *Id.* at 2. All of the promises in the Settlement Agreement are made by the Manager to the River Valley banks or by the banks to the Manager. *See, e.g., id.,* § 7.1 ("To induce the Manager to enter into this Settlement Agreement and to consummate the transactions contemplated herein, each of the River Valley Banks makes the following representations and warranties to the Manager ...."); § 7.2(b) ("this Settlement Agreement is a legal, valid, and binding obligation of the Manager and the FRF and is enforceable against the Manager and the FRF in accordance with its terms."). Nowhere in the Settlement Agreement do the parties manifest an intent to make a promise to, or receive a promise on behalf of, the United States generally or any agency of the United States other than "the Manager." Coupled with the language of the Accord and Satisfaction clause that provides that "per-

---

13. Plaintiff presents the release executed by the Metropolitan Federal Bank of North Dakota as an example of how the Settlement Agreement could have released entities in addition to just the FDIC as manager of the FRF. There, the bank "release[d] and forever discharge[d] the FDIC, the RTC, the [OTS], the FSLIC, the FRF and the Federal Home Loan Bank Board, their respective officers, directors, employees and agents and the respective successors of all of the

foregoing, including, without limitation, any receiver or trustee in bankruptcy...." Pls.' Second Supp.App., Tab 1 at MSJ 0037; Pl.'s Reply at 11–12. In contrast, the Settlement Agreement at issue here was only entered into "by and among the [FDIC], in its capacity as manger of the [FRF], RIVER VALLEY SAVINGS BANK ..., HOMER J. HOLLAND, and HOWARD R. ROSS." Def.'s Supp.App., Ex. 3 at 1. *See Statesman,* 41 Fed.Cl. at 9 n. 7.

formance by each party" discharges the obligations and liabilities of "such party" under the Assistance Agreements, *id.*, § 5, the Settlement Agreement's clear definition of the parties to the agreement unambiguously establishes that the parties intended to discharge only liabilities of the FDIC, as manager of the FRF, and not liabilities of the United States as a whole.[14] Therefore, if any other agency of the Government bore contractual liability for the forbearance promises contained in the River Valley I and II contracts, then the Settlement Agreement would not discharge plaintiff's claims against the United States in this case.

The Court must therefore determine whether FDIC, as manager of the FRF, bore exclusive contractual liability for the promises or whether OTS bore such liability, either exclusively or concurrently with FDIC. Before oral argument, the Court asked the parties to address the relevance of certain language of the Federal Circuit in two *Winstar*-related cases stating that the FRF was the proper source of potential recovery in those cases because the breach claims were FSLIC liabilities. *Glass v. United States,* 258 F.3d 1349, 1355 (Fed.Cir.2001); *Landmark Land Co., Inc. v. FDIC,* 256 F.3d 1365, 1381 (Fed.Cir.2001). The Court also asked

the parties to address the relevance, if any, of the position of the Office of Legal Counsel ("OLC") of the Department of Justice concerning the proper source for the payment of *Winstar*-related judgments.[15] In its Order of May 5, 2006, the Court asked the parties to file supplemental briefs (in light of authorities relied upon for the first time during oral argument) addressing the question whether the contractual liability for the regulatory capital forbearance promises passed to the FRF or to OTS and the consequence to defendant's accord and satisfaction defense if OTS bore any contractual liability for the promises.

In its supplemental brief, defendant argued first that the forbearance promises became contractual liabilities of the FRF alone because section 215 of FIRREA, now codified at 12 U.S.C. § 1821a, transferred the liabilities and assets of FSLIC to the FRF, while section 410 of FIRREA transferred only the regulatory functions of FSLIC and the FHLBB to OTS. Def.'s First Suppl. Br. at 2. In support of this argument, defendant stated that:

> [A]lthough Congress or OTS may have taken actions that resulted in a breach of plaintiffs' contracts, those contracts were with FSLIC, and the assets and liabilities

---

**14.** The Court need not decide whether the Government as a whole was an intended third-party beneficiary of a promise by plaintiff's predecessors-in-interest (to the FDIC as manager of the FRF) to discharge all liabilities of the United States. Plaintiff's predecessors made no such promise in the Settlement Agreement. *See also* Def.'s Supp.App., Ex. 3, § 8(k) ("Except as expressly provided in this Settlement Agreement, no provision of this Settlement Agreement is intended to benefit any persons other than the parties thereto.").

**15.** OLC concluded:

> Because payment is "otherwise provided for" within the meaning of the Judgment Fund statute, the Judgment Fund is not available to pay such judgments and settlements. In sum, we believe that the FRF is the appropriate source of funds to pay judgments and settlements in *Winstar*-related cases in which FSLIC was a party to an Assistance Agreement or Supervisory Action Agreement.

Appropriate Source for Payment of Judgments and Settlements in *United States v. Winstar Corp.,* 22 Op. Off. Legal Counsel 141, 165 (1998) (internal citation omitted). In reaching this outcome,

OLC noted that in *Winstar*-related cases involving FSLIC assistance agreements, monetary liability rested with FSLIC, and not the FHLBB, for the purposes of identifying the proper statutory source of payment. *See id.* at 156. According to OLC, it was FSLIC that exercised its contracting authority (and thereby assumed contractual liability) in entering into the agreements underlying the *Winstar*-related cases, while the FHLBB was only "acting through" FSLIC's contracting authority in its capacity as the "operating head" of FSLIC. *Id.* OLC further stated:

> At least for purposes of [12 U.S.C.] § 1821a(a)(2), the fact that the "United States" appears as the defendant in the *Winstar*-related cases does not make any liabilities resulting from FSLIC agreements liabilities of the United States as a whole rather than of FSLIC. The styling of the captions in these cases simply reflects the requirement that all cases brought in the CFC must be brought against the "United States," *see* 28 U.S.C. § 1491(a) (1994), a requirement that obtains without regard to the source from which payments would be made for any liability that results from such litigation.

*Id.* at 156 n. 13.

embedded in those contracts, including liability for the breach of those contracts, transferred to FRF. They did not transfer to OTS. Regardless of who undertook the actions leading to the alleged breach, FSLIC, and then FRF, was liable for any such breach.

*Id.* at 3. Second, defendant asserts that all of the assets and liabilities of the Assistance Agreements transferred to the FRF alone, and that plaintiff has provided no evidence of congressional intent to "cut out" the forbearance promises from the rest of the promises in the Assistance Agreements and transfer the forbearance promises to OTS instead of the FRF. *Id.* at 3–4. Defendant cites the OLC opinion to rebut plaintiff's assertion that liability for breach of the forbearance promises did not transfer to the FRF because they were not liabilities "existing on the day before August 9, 1989" (FIRREA's description of the assets and liabilities that transferred to the FRF upon the passage of FIRREA on August 9, 1989). *See id.* at 4–6. Third, defendant argues that because the Assistance Agreements incorporated the FHLBB resolutions and forbearance letters, the FHLBB bore no separate and independent liability for the forbearance promises under the River Valley I and River Valley II contracts and, therefore, no contractual liability passed to OTS. *See id.* at 7–12.

Plaintiffs respond first that section 401 of FIRREA transferred responsibility for the forbearance promises to OTS. In support of this contention, plaintiffs note that FIRREA vested OTS with exclusive authority and responsibility for the regulation of capital requirements for savings and loan institutions. *See* Pls.' First Suppl. Br. at 3. Plaintiffs also cite OTS's own initial organizational statement as an indication that OTS understood FIRREA to transfer the contractual liability for the forbearance promises to it. *See id.* (citing Statement of Organization, Function, and Delegations of Authority, OTS, 54 Fed. Reg. 34637–01 (Aug. 21, 1989)). Additionally, plaintiffs observe that FDIC's highest-ranking official testified before Congress that the FRF should not be liable for judgments against the United States in the *Winstar*-related cases because neither FSLIC nor FDIC, as manager of the FRF, had engaged in actionable conduct with respect to the forbearance promises and that Congress and OTS were responsible for the breaches of those promises. *See id.* at 4. Second, plaintiffs argue that the forbearance promises were not liabilities of FSLIC existing on the day before the enactment of FIRREA (directly contesting OLC's position that the promises were contingent liabilities of FSLIC on August 8, 1989) and therefore did not transfer to the FRF. *See id.* at 5–10. Third, plaintiffs contend that because the forbearance promises were included in the FHLBB resolutions and forbearance letters (and not only in the FSLIC Assistance Agreements) they were contractual promises of the FHLBB and therefore transferred to the FHLBB's successor agency, OTS, upon the passage of FIRREA. *See id.* at 10–13.

Section 215 of FIRREA, as codified at 12 U.S.C. § 1821a, established the FRF as "a separate fund . . . which shall be managed by the [FDIC] and separately maintained and not commingled." § 1821a(a)(1) (2000). The statute further provided: "Except as provided in section 1441a of this title, all assets and liabilities of the Federal Savings and Loan Insurance Corporation on the day before August 9, 1989, shall be transferred to the FSLIC Resolution Fund." § 1821a(a)(2)(A). Section 401 abolished both FSLIC and the FHLBB and stated:

(h) CONTINUATION OF ORDERS, RESOLUTIONS, DETERMINATIONS, AND REGULATIONS.—Subject to section 402, all orders, resolutions, determinations, and regulations, which—

(1) have been issued, made, prescribed, or allowed to become effective by the Federal Savings and Loan Insurance Corporation or the Federal Home Loan Bank Board . . . or by a court of competent jurisdiction, in the performance of functions which are transferred by this Act [FIRREA, Pub.L. No. 101–73]; and

(2) are in effect on the date this Act takes effect [Aug. 9, 1989],

shall continue in effect according to the terms of such orders, resolutions, determinations, and regulations and shall be enforceable by or against the Director of the

Office of Thrift Supervision, the Federal Deposit Insurance Corporation, the Federal Housing Finance Board, or the Resolution Trust Corporation, as the case may be, until modified, terminated, set aside, or superseded in accordance with applicable law by the Director of the Office of Thrift Supervision, the Federal Deposit Insurance Corporation, the Federal Housing Finance Board, or the Resolution Trust Corporation, as the case may be, by any court of competent jurisdiction, or by operation of law.

FIRREA § 401(h). Shortly after the enactment of FIRREA, OTS issued an organizational statement interpreting FIRREA's effect:

Pursuant to the FIRREA, all rules, regulations, resolutions (including delegations), agreements, contracts, orders, directives, decisions, enforcement proceedings, legal actions, formal examinations and investigations, and other determinations of the Bank Board and the FSLIC not transferred to the Federal Deposit Insurance Corporation or the Federal Housing Finance Board, which were in force and effect on the day prior to enactment of FIRREA, remain in effect and enforceable by the Office, until such time as modified, canceled, or repealed by the Office.

Statement of Organization, Function, and Delegations of Authority, OTS, 54 Fed.Reg. 34637–01 (Aug. 21, 1989) (citing, *inter alia,* FIRREA § 401(g)-(h)).

As set forth above, defendant argues that section 215 transferred all of the forbearance promises contained in the River Valley I and II Contracts to the FRF, while plaintiff argues that section 401 transferred the forbearance promises to the OTS. For the reasons that follow, the Court holds that OTS became bound by the forbearance promises contained in the FHLBB resolutions and forbearance letters and, therefore, the Settlement Agreement between Holland, Ross, River Valley III and FDIC, as manager of the FRF, did not discharge the United States from liability for such forbearance promises.

As further noted above, the Federal Circuit has stated in two *Winstar*-related cases

that "[a]ny damages paid by the United States to satisfy the [receiver-plaintiff] FDIC's breach of contract claim, however, will also come from the FRF, specifically, from the FRF–FSLIC. Because the FSLIC was a party to the contract with Security, the damages claim is an FSLIC liability for which the FRF–FSLIC is responsible." *Glass,* 258 F.3d at 1355 (citing *Resolution Trust Corp. v. FSLIC,* 25 F.3d 1493 (10th Cir.1994) ("*RTC*")). "Because the FSLIC was the governmental party to the alleged contract under which the FDIC [as receiver-plaintiff] has brought suit, the damages claim is an FSLIC liability, and any recovery will be paid out of the FRF–FSLIC fund." *Landmark,* 256 F.3d at 1381 (citing 12 U.S.C. § 1281a(d)). In addition, OLC opined, "we do not believe that, for purposes of determining the statutory source of payment, such liabilities [for breach of contract] could be attributed to the Bank Board" because the FHLBB was acting through FSLIC's contracting authority and was only exercising authority in connection with the assistance agreements in its capacity as the "operating head" of FSLIC. 22 Op. Off. Legal Counsel at 156.

The determination of the proper *source of payment* for a judgment in a *Winstar*-related case, however, is neither coextensive with nor dispositive of the instant question, *i.e.,* which agency or agencies were *contractually liable* for the forbearance promises after the enactment of FIRREA. Indeed, the only case to directly address the question indicates that OTS at least shared contractual liability for the forbearance promises. In *RTC,* the Tenth Circuit upheld a rescission and restitution award for breach of supervisory and regulatory goodwill promises (contained in a contract consisting of an assistance agreement, a FHLBB resolution, and a FHLBB letter), *see RTC,* 25 F.3d at 1499–1500, 1504–05, and identified the FRF as the proper source of payment for the restitution. *See id.* at 1505–06. In rejecting the defendant agencies' argument that payment should come from the RTC, rather than the FRF, the court noted: "Under FIRREA, OTS became the primary federal regulator of federal and state savings associations and FDIC as-

sumed FSLIC's deposit insurance functions. *Both of these agencies succeeded to contract rights and obligations created by their predecessors."* *Id.* at 1505 (emphasis added, internal citations omitted). The court continued: "After Congress enacted FIRREA, *contract obligations* to New Security *resided with OTS, as successor to FHLBB,* and FDIC, as successor to FSLIC." *Id.* (emphasis added). Most importantly, after determining that the judgment should be paid from the FRF, the court refused to dismiss OTS as a defendant: "OTS's argument that the claim against it should be dismissed as moot also fails because *OTS nevertheless possessed contract obligations* to New Security *even though the FSLIC Resolution Fund provides the source for restitution.* We agree with the district court that OTS is an indispensible [sic] party." *Id.* at 1505 n. 2 (citing Fed.R.Civ.P. 19) (emphasis added).

The proposition that OTS bears contractual liability for the forbearance promises also finds indirect support in both Justice Souter's plurality opinion and the Federal Circuit's en banc opinion in the *Winstar* case. Both decisions establish that the FHLBB was contractually bound to the *Winstar* plaintiffs: "[W]hat the Federal Circuit said of the Glendale transaction is true of the Winstar and Statesman deals as well: *'the Bank Board* and the FSLIC *were contractually bound* to recognize the supervisory goodwill and the amortization periods reflected'* in the agreements between the parties." *Winstar,* 518 U.S. at 868, 116 S.Ct. 2432 (quoting the *en banc* decision of the Federal Circuit in *Winstar* ) (emphasis added); *see also Holland I,* 57 Fed.Cl. at 567

(stating that the Federal Circuit in *Winstar* found that "the FHLBB and the FSLIC were contractually obligated to recognize" the goodwill promises). The plurality further stated that "the Government's ability to set capital requirements is not limited by *the Bank Board's* and FSLIC's *promises to make good any losses* arising from subsequent regulatory changes." *Winstar,* 518 U.S. at 889, 116 S.Ct. 2432 (emphasis added). The Federal Circuit further concluded:

> There can be little question that the application of FIRREA and the regulations thereunder to deny or restrict plaintiffs' contractual rights to use supervisory goodwill with the associated amortization periods, and for Statesman's capital credits, in partial satisfaction of their capital requirements was a breach of the FSLIC's *and the Bank Board's agreements* with them.

*Winstar,* 64 F.3d at 1544 (emphasis added). Furthermore, in this case Judge Horn based her ruling that defendant breached the River Valley I contract in part on the fact that "defendant does not deny that *the FHLBB* and FSLIC *granted forbearance agreements* that allowed $8 million of the FSLIC cash assistance and $4.6 million of subordinated debt to be issued by River Valley I to be treated as regulatory capital...." *Holland I,* 57 Fed.Cl. at 565 (emphasis added).

The fact that the FHLBB was bound by the forbearance promises is relevant because OTS succeeded to such liabilities of the FHLBB. While section 215 of FIRREA might be ambiguous as to whether it transferred liability for regulatory forbearance promises of the FSLIC to the FRF,[16] it

---

**16.** The Court need not, and does not, decide the question whether contractual liability for the forbearance promises also transferred to the FRF or transferred solely to OTS upon the enactment of FIRREA (although *RTC* indicates that, in the Tenth Circuit's view, the forbearance promises of the FSLIC indeed transferred to the FRF). The Court therefore does not address plaintiff's argument that the forbearance promises made by FSLIC were not "liabilities of the [FSLIC] on the day before August 9, 1989" within the meaning of section 215 of FIRREA. 12 U.S.C. § 1281a(a)(2)(A). Nor does the Court address defendant's argument that plaintiff has provided no evidence of congressional intent to "cut out" the forbearance promises from the rest of the promises made by FSLIC in the Assistance

Agreements and transfer the forbearance promises to OTS instead of the FRF.

Whether the release of one party who shares liability on a contract releases all of the parties to the contract depends on whether the parties share joint or joint and several duties. The release of any joint party generally discharges all of the parties of their contractual duties, whereas the release of one joint and several party does not discharge any other party to the contract. RESTATEMENT (SECOND) OF CONTRACTS § 294(1) (1981). Section 22 of the Assistance Agreements says that, to the extent Federal law does not control the Assistance Agreements, Illinois law will govern them. JA 4363, 4884. Under Illinois law, in general "all joint obligations and

expressly transfers to the FRF only liabilities of the FSLIC, not liabilities of the FHLBB. Liabilities of the FHLBB, including contractual liabilities for forbearance promises made in FHLBB resolutions and forbearance letters, transferred to the OTS as successor to the FHLBB upon the passage of FIRREA. *See* FIRREA § 401(h); 54 Fed.Reg. 34637–01; *RTC*, 25 F.3d at 1505.

The Court rejects defendant's argument that, because the FSLIC Assistance Agreements incorporated the FHLBB resolutions and forbearance letters, the FHLBB did not bear contractual liability for the forbearance promises under the River Valley I and River Valley II contracts and, therefore, no contractual liability passed to OTS. Although defendant is correct that the Assistance Agreements expressly incorporate the FHLBB resolutions and forbearance letters, *see supra* pp. 245–46, defendant's argument nonetheless fails because the incorporation of the FHLBB resolutions and forbearance letters into the Assistance Agreements between FSLIC and River Valley cannot possibly have the effect defendant urges here, *i.e.*, to expunge the FHLBB as a party to the River Valley I and II contracts. Rather, the incorporation of the FHLBB documents into the Assistance Agreements reinforces the conclusion that FHLBB was contractually bound by the River Valley I and II contracts. The Federal Circuit reached essentially the same conclusion in its *en banc* decision in *Winstar*:

"We conclude based on all of the contemporaneous documents, which *under the integration clause* of the SAA collectively constituted the 'Agreement' of the parties, that *the Bank Board and the FSLIC were contractually bound* to recognize the supervisory goodwill and the amortization periods reflected in the approved accountants' letter." *Winstar*, 64 F.3d at 1541–42 (emphasis added).

Furthermore, the Federal Circuit has established that in *Winstar*-type cases, assistance agreements are not the *sine qua non* of the contractual relationships between the Government and the financial institutions. In *Home Savings of America, FSB v. United States*, 399 F.3d 1341 (Fed.Cir.2005), the court accepted plaintiff H.F. Ahmanson & Co.'s ("Ahmanson") argument that

> even though Ahmanson was not a party to the Assistance Agreements—and here the plaintiffs point out that FHLBB was not a party to the Assistance Agreements either—Ahmanson was a party to the contractual arrangement as a whole by way of FHLBB's Resolutions.... [T]he Resolutions were "unified" with the Assistance Agreements because the integration clauses defined the "Entire Agreement" as including not just the Assistance Agreements themselves but also the related resolutions issued by FHLBB.

covenants shall be taken and held to be joint and several obligations and covenants." 765 ILL. COMP. STAT. ANN. 1005/3 (2006); *see also Brokerage Resources, Inc. v. Jordan*, 80 Ill.App.3d 605, 608, 35 Ill.Dec. 940, 400 N.E.2d 77 (Ct.1980) ("Parties to a contract are more likely to have a joint and several contractual obligation if they have a joint or identical interest in the contract or its subject matter, instead of diverse interests."). The FRF and OTS would have had a joint interest in the Assistance Agreements. If OTS and the FRF were both contractually liable for the forbearance promises, that contractual liability would have been joint and several. In light of the Court's holding that OTS at least shared the contractual liability for the forbearance promises contained in the River Valley I and II contracts, and that the Settlement Agreement did not discharge such OTS liability, the question of FDIC's concurrent liability cannot be dispositive of plaintiff's claims in this court.

The Court, however, rejects plaintiff's arguments that are based on the notion that OTS

rather than FDIC is contractually responsible for the breach because the breach was caused by OTS's, rather than FDIC's, conduct. Such an argument is inconsistent with the plurality's opinion in *Winstar*. *See Winstar*, 518 U.S. at 868–69, 116 S.Ct. 2432 ("We read this promise [to recognize the contractual supervisory goodwill and amortization period] as the law of contracts has always treated promises to provide something beyond the promisor's absolute control, that is, as a promise to insure the promisee against loss arising from the promised condition's nonoccurrence."); *cf. Fifth Third Bank of W. Ohio v. United States*, 402 F.3d 1221, 1234 (Fed.Cir.2005) (holding, in accordance with the plurality opinion, that a promise by the Government not to change regulations is not necessary to *Winstar*-type contractual liability). It is the identity of the promisor agency, *i.e.*, the contractually-bound agency, that is relevant to the present inquiry, not the identity of the agency whose actions caused the promisor agency to find itself in breach of contract.

*Home Sav.*, 399 F.3d at 1348–49. The court concluded that "the Court of Federal Claims properly focused on a set of 'larger transaction[s]' involving Ahmanson, FSLIC, FHLBB, and Home.... In each transaction, the Assistance Agreement is not the entire contract; *the Resolutions contain reciprocal promises that were part of the overall bargains* between the plaintiffs and the government." *Id.* at 1349 (internal citations omitted) (emphasis added); *see also Fifth Third Bank of W. Ohio v. United States*, 402 F.3d 1221, 1231 (Fed.Cir.2005) (finding, in the absence of a written agreement with FSLIC, that "there was a contractual agreement between Citizens and the FHLBB regarding special treatment of supervisory goodwill"); *Cal. Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1346–47 (Fed.Cir.2001) (finding, in the absence of an assistance agreement or SAA, that "the FHLBB and the FSLIC were contractually bound to recognize the supervisory goodwill and the amortization periods reflected in the forbearance letters" based upon contemporaneous documents such as FHLBB resolutions and correspondence). Defendant's invocation of *Southern California Federal Savings & Loan Association v. United States*, 422 F.3d 1319 (Fed.Cir.2005) ("*SoCal*") is unavailing as to this issue. In *SoCal*, the Federal Circuit addressed the individual investor-plaintiffs' assertion that they were parties to an assistance agreement

based upon their status as parties to a related regulatory capital maintenance agreement. *See SoCal*, 422 F.3d at 1329. The court rejected the argument because the regulatory capital maintenance agreement was *not* incorporated into the assistance agreement by the Entire Agreement clause, which incorporated FHLBB and FSLIC letters and resolutions. *See id.* at 1329–31. Nowhere did the *SoCal* court contravene the instruction of *Home Savings* that, when considering promises contained in FHLBB resolutions and letters that were incorporated by the assistance agreement, "the Assistance Agreement is not the entire contract; the Resolutions contain reciprocal promises that were part of the overall bargains between the plaintiffs and the government." *Home Sav.*, 399 F.3d at 1349.[17]

Here, the Federal Circuit's holdings establish that the integration of the FHLBB resolutions and forbearance letters into the FSLIC Assistance Agreements did not eliminate the FHLBB as a contractual party and thereby leave FSLIC as the only governmental party to the forbearance promises. Although there exists but one contract between the thrift and the Government for each merger transaction in this case, the FHLBB was a party to each contract and the forbearance promises contained therein by virtue of the resolutions and forbearance letters reflecting those promises.[18] Upon enactment

17. Defendant also relies upon *Franklin Federal Savings Bank v. United States*, 431 F.3d 1360 (Fed.Cir.2005), concluding that "[h]ere, as in *Franklin*, claims based upon separate and independent FHLBB promises are barred because, pursuant to the primary contractual agreements with FSLIC (and their settlement), plaintiffs are barred from asserting liability claims." Def.'s First Suppl. Br. at 12. *Franklin*, however, is distinguishable. In that case, which did not involve an assistance agreement or SAA, the FHLBB approval letter and forbearance letter were found to be merely non-contractual "regulatory approvals that could only become enforceable by the mechanism of the [subsequently-executed] Dividend Agreement." *Franklin*, 431 F.3d at 1366. Furthermore, "the integration clause of the Dividend Agreement [which did not specify that contemporaneous letters or resolutions were incorporated] *did not incorporate* the Approval and Forbearance Letters into the Dividend Agreement." *Id.* (emphasis added). By contrast, Judge Horn found that the FHLBB resolutions and forbearance letters in this case were

not merely regulatory actions but rather memorialized the contractual agreements among the parties. *See Holland I*, 57 Fed.Cl. at 562–66. Here, the Assistance Agreements did incorporate the resolutions and letters, thereby making the FHLBB a party to the overall transactions.

18. For the purpose of assigning contractual liability for the forbearance promises, OLC's understanding that the FHLBB was acting through FSLIC's contracting authority and was merely acting in its capacity as the "operating head" of FSLIC with respect to FSLIC assistance agreements does not change the Court's analysis. *See* 22 Op. Off. Legal Counsel at 156. First, although the Court does not question OLC's conclusion that this distinction is relevant to identifying the proper source for the payment of *Winstar*-related judgments, the means by which the FHLBB bound itself to the contracts (whether or not through the FSLIC's contracting authority) does not change the result that the FHLBB was bound. Second, based upon the "operating head" distinction, OLC determined

of FIRREA, OTS became responsible for the FHLBB's contractual promises. Because the Settlement Agreement did not purport to discharge claims against government agencies other than the FDIC, in its capacity as manager of the FRF, or against the United States generally, defendant's affirmative defense of accord and satisfaction fails.

## IV. Plaintiff First Bank's Express Contract Claims Are Not Barred on the Ground That First Bank's Predecessors in Interest Did Not Obtain Written Consent to Transfer Rights Under the Assistance Agreements in Connection With Previous Mergers and Acquisitions

■ Defendant contends that plaintiff First Bank's predecessors-in-interest failed to comply with the provision of Section 25 of the Assistance Agreements that "this Agreement may not be assigned to any party nor may any rights or obligations under it be transferred or delegated to or vested in any other party, through merger, consolidation, or otherwise, without the prior written consent of the [FSLIC]" and, therefore, plaintiff's claims are barred. *See* Def.'s Resp. at 37–40; Def.'s Reply at 25–28. According to defendant:

> [T]hrough a series of mergers of River Valley I and River Valley II, of River Valley III and First Bank, FSB, and First Bank FSB [sic] and St. Charles; and First Bank, FSB (the renamed St. Charles) and First Bank, at no time did any of these entities ... ever request, let alone obtain, the "prior written consent" of the FDIC

(as successor to the FSLIC) to assign any of the rights or obligations under the River Valley I or River Valley II assistance agreements.

Def.'s Resp. at 37. Furthermore, to the extent that the thrifts obtained "general approvals to the mergers" from OTS, such approvals "do not constitute prior written consent to the vesting of the rights of the Assistance Agreements to another party as expressly required." Def.'s Reply at 27. Defendant therefore argues that "because First Bank's express contract claims are premised directly upon" the rights of the River Valley thrifts under the Assistance Agreements, "those claims are barred by the very terms of those agreements...." Def.'s Resp. at 39.

Plaintiff responds by characterizing defendant's argument as an effort by defendant to relitigate the issue of plaintiff's standing and urging that the argument is waived due to defendant's failure to raise it during briefing regarding First Bank's joinder. *See* Pl.'s Reply at 20. Plaintiff further argues that defendant "is barred from even raising as an affirmative defense River Valley's alleged breach of ... [S]ection 25 ... because Defendant did not plead prior material breach in its ... Answer to the Third Amended Complaint [docket entry 269]." Pls.' Second Suppl. Br. at 1. Plaintiff also argues that defendant's challenge fails on the merits because neither the Assistance Agreements nor any other contractual documents required River Valley and its successors to obtain authority to transfer causes of action for

that for the purposes of 12 U.S.C. § 1821a(a)(2), "any liabilities resulting from the [assistance] agreements would be 'liabilities' of FSLIC, rather than of the Bank Board." *Id.* However, the Federal Circuit has subsequently established that the assistance agreements do not alone define the contractual relationship among the parties and that the FHLBB had the capacity to make reciprocal promises to the thrifts either in the presence or absence of a FSLIC assistance agreement. *See Home Sav.,* 399 F.3d at 1348–49; *Fifth Third Bank,* 402 F.3d at 1231; *Cal. Fed.,* 245 F.3d at 1346–47. While this might not affect the proper source of payment, it does support a finding that the FHLBB was liable for the forbearance promises. Third, although FHLBB Resolutions 88–612 and 88–638 frequently indicate on a paragraph-by-paragraph

basis when the FHLBB is speaking as the operating head of FSLIC, the paragraphs in the "Accounting" sections of each resolution, where the bulk of the regulatory capital forbearance promises appear, contain no such indication. *See* JA 4377–78; JA 5000–01. Furthermore, the "Forbearances" section of each resolution authorizes and directs the Secretary or an Assistant Secretary of the FHLBB "to send to River Valley a letter concerning forbearances *by the Bank Board* and the FSLIC with respect to certain regulatory requirements...." JA 5002 (emphasis added); *see* JA 4379–80. The Assistant Secretaries subsequently issued such letters. Therefore, the River Valley I and II contracts, when considered in their entirety, indicate that the FHLBB was itself contractually bound to the thrifts.

breach of contract; rather, the Assistance Agreements required approval to assign the contract or rights under the contract, by merger, consolidation, or otherwise. Pl.'s Reply at 20. Further, plaintiff asserts, every merger in the chain of transactions by which River Valley's interests became those of First Bank was approved by the regulatory authorities. *See id.* at 21–22. Plaintiff argues that, even if the thrifts did not comply with the terms of the Assistance Agreements, their breach claims were not extinguished because all of the mergers occurred after the Government's breach of the forbearance promises. *See id.* at 22. Finally, plaintiff notes that, apart from the merger of the River Valley thrifts in March 1991, all of the mergers that defendant questions took place after the Settlement Agreement terminated the Assistance Agreements, and therefore the contractual requirement for prior written consent of the FSLIC no longer had any force or effect. *See id.*

In general, under RCFC 8(c), "a failure to plead an affirmative defense ... results in the waiver of that defense and its exclusion from the case...." Pls.' Second Suppl. Br. at 1 (quoting 5 CHARLES ALAN WRIGHT AND ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1278 (3d ed.2004)) (alterations in original).[19] However, depending on the circumstances, there are many exceptions to this waiver rule. "[T]he substance of many unpleaded Rule 8(c) affirmative defenses may be asserted by pretrial motions, particularly in the absence of any showing of prejudice to the opposing party and assuming it has had an opportunity to respond." 5 WRIGHT & MILLER § 1278. In *District of Columbia v. United States*, 67 Fed.Cl. 292 (2005), this court held that, although defendant had failed to plead the affirmative defense of accord and satisfaction, the affirmative defense was not automatically extinguished. *District of Columbia*, 67 Fed.Cl. at 336. Rather, "the purpose of Rule 8(c) is simply to guarantee that the opposing party has notice of any additional issue that may be raised at trial so that the party is prepared to properly

litigate it." *Id.* Both parties were able to fully brief the accord and satisfaction issue, so there was no prejudice in permitting the later assertion of the affirmative defense.

In the present case, there is likewise no prejudice in permitting defendant's assertion that plaintiff's predecessors-in-interest failed to comply with Section 25 of the Assistance Agreements. Although not raised in defendant's Answer, it was raised in defendant's cross-motion for summary judgment. Def.'s Resp. At 37–40. Both parties have fully briefed the issue. *See, e.g., id.;* Def.'s Reply at 25–28; Def.'s Second Suppl. Br.; Pl.'s Reply at 20–24; Pls.' Second Suppl. Br. Because both parties have had the opportunity to adequately address the significance of Section 25, to bar defendant from asserting it as an affirmative defense would be unwarranted.

The August 14, 1991 Settlement Agreement terminated the Assistance Agreements. Therefore, the Agreements' requirement of prior written approval by the FSLIC (or its successor) was no longer in effect with respect to mergers involving plaintiff's predecessors-in-interest that occurred after August 14, 1991. Thus, the Court need only address the effect of the March 1991 merger of River Valley I and River Valley II to form River Valley III (the "River Valley III merger") upon plaintiff's claims.

With respect to the River Valley III merger, the Court concludes that Section 25 of the Assistance Agreements did not require FSLIC approval of the transfer of a cause of action for a pre-existing breach of contract. Section 25 provides in its entirety:

> All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of the parties and their respective transferees, successors, and assigns, but this Agreement may not be assigned to any party nor may any rights or obligations under it be transferred or delegated to or vested in any other party, through merger, consolidation, or otherwise, with-

---

19. Although the quoted portion of the treatise refers to the Rule 8(c) of the Federal Rules of Civil Procedure, the Rules of the United States Court of Federal Claims are intended to conform, insofar as is practicable, to the Federal Rules of Civil Procedure. *See* RCFC 2002 Rules Committee Note at 1.

out the prior written consent of the [FSLIC].

JA 4364–65; 4885–86. While defendant is correct that "[t]he plain reading of the Assistance Agreements is that their provisions *would* be binding and inure to transferees, but not without the prior written consent of the FSLIC, and barring that consent, *no rights or obligations would inure* to any other party *including through merger*," Def's Reply at 27, plaintiff does not assert that the Assistance Agreements, or any rights or obligations under the Assistance Agreements, were transferred as a result of the mergers in question. The forbearance promises were breached at least fifteen months prior to the River Valley III merger in March 1991. Rather than rights under the Assistance Agreements, plaintiff asserts that a cause of action for the Government's breach of the forbearance promises was transferred to plaintiff as a result of a series of mergers involving plaintiff's predecessors-in-interest.

As a general rule, and absent language in the contract to the contrary, plaintiff's cause of action would have clearly transferred from River Valley II to River Valley III as successor-in-interest by operation of law. As plaintiff points out, in the context of the merger, dissolution, reorganization, or conversion of federal savings associations, "[a]ll rights and obligations of the merging association shall remain unimpaired, and the resulting association shall, on the effective date of merger, succeed to all those rights and obligations." 12 C.F.R. § 546.3 (1991). Pursuant to Section 25, however, neither the Assistance Agreements nor any rights or obligations *under the Assistance Agreements* would transfer to a successor entity absent written regulatory approval.

Plaintiff argues, however, that a claim for breach of contract is not a right or obligation under the contract, that there is no intention manifest in the Assistance Agreements to prevent the transfer of a cause of action for breach, and, therefore, plaintiff's cause of action is not subject to the "Successors and Assigns" limitation of Section 25. Pls.' Second. Suppl. Br. at 3. Unless a contract clearly indicates otherwise, "[a] contract term prohibiting assignment of rights . . .

does not forbid assignment of a right to damages for breach of the whole contract. . . ." Restatement (Second) of Contracts § 322(2)(a) (1981). Illinois law, which governs the contract, *see* JA 4363, 4884, adopts the approach of the Restatement that "[w]here the right assigned is tantamount to . . . a damage claim, the one obligated to pay cannot complain that he or she must pay Entity A as opposed to Entity B." *Lomas Mortgage U.S.A., Inc. v. W.E. O'Neil Constr. Co.*, 812 F.Supp. 841, 844 (N.D.Ill.1993). *See also Health Alliance Network, Inc. v. Cont'l Cas. Co.*, 354 F.Supp.2d 411, 417 & n. 8 (S.D.N.Y.2005) (under Illinois law, "a non-assignment clause does not prohibit assignment of a right to damages for breach of the whole contract . . . ."); *cf. Loyola Univ. Med. Ctr. v. Med. Care HMO*, 180 Ill.App.3d 471, 129 Ill.Dec. 360, 535 N.E.2d 1125, 1128–29 (Ct.1989) (in the insurance context, non-assignment clause does not bar assignment of right to payment once loss has occurred).

Defendant argues in response that "Illinois law requires stringent and literal interpretations of anti-assignment provisions," citing *Bank of America, N.A. v. Moglia*, 330 F.3d 942, 946–48 (7th Cir.2003) as support for that proposition. Def.'s Reply to Pls.' Second Suppl. Br. at 2. *Bank of America* admittedly holds that Illinois law will enforce anti-assignment clauses, as literally formulated in a contract, but its holding does not conflict with plaintiff's assertion that Section 25 did not prevent the transfer to its successor-in-interest of River Valley II's cause of action for breach of contract. In *Bank of America*, the court evaluated an anti-assignment clause forbidding a rabbi trust from transferring its assets. That Illinois law will enforce such a clause does not conflict with the rule that an anti-assignment clause does not prevent the assignment of a right to damages for *breach of contract* unless the contract expressly prevents such an assignment. The plain language of Section 25 barred plaintiff from transferring the Assignment Agreement, including rights and obligations under the Assignment Agreement, without FSLIC's regulatory approval; it did not, however, "clearly and unambiguously prohibit the assignment

of the right to pursue a claim for breach of the contract." 812 F.Supp. at 844.[20]

The Government also argues that, under *SoCal,* the "Sole Benefit" clause prevents First Bank from having standing to assert any breach of contract claim against the Government. Def.'s Second Suppl. Br. at 5–6. *SoCal,* according to the Government, stands for the proposition that "the assignment of a cause of action to a non-party to the Assistance Agreements" would contravene the Sole Benefit clause. *Id.* In *SoCal,* the Court of Appeals for the Federal Circuit held that the Sole Benefit clause prevented shareholders who were not parties to the Assistance Agreement from having standing to sue for breach of the Assistance Agreement. *SoCal,* 422 F.3d at 1332. The court based its holding on the fact that the plaintiffs were shareholders, however, and that "[h]aving chosen to limit their personal liability by adopting a corporate form, we have refused to allow shareholders to rely on their involvement in the negotiation process or their role in funding a transaction to alter their legal status." *Id.* The issue in connection with the pending motions is not whether a shareholder, or other third-party, has standing to assert a claim for breach of contract. Instead, it is whether a successor entity, which stepped into the shoes of River Valley II, has standing.

Furthermore, the Settlement Agreement itself provides some evidence that the FDIC considered the newly-created River Valley III to be the successor-in-interest to River Valley II and the proper party to settle the Assistance Agreements. Along with Holland and Ross, River Valley III was the FDIC's counter-party to the Settlement Agreement, in its own right and as successor by merger to River Valley II, which merged into River Valley I to form River Valley III. It is unclear why FDIC would settle the Assistance Agreements (especially the River Valley II Assistance Agreement) by executing an agreement with a party that had not properly succeeded to the rights and obligations contained in the Assistance Agreements. Furthermore, it is clear from the Settlement Agreement that FDIC believed that is was settling, with River Valley III, its ongoing assistance obligations under both Assistance Agreements. Defendant, of course, does not argue that the Settlement Agreement (and the Accord and Satisfaction clause contained therein) is invalid because it was executed by River Valley III, which, according to defendant, had succeeded to the rights of River Valley II by merger without the prior written consent of the FSLIC.

**V. Defendant Is Not Liable for the Phase-out from Regulatory Capital Computations of $5,000,000 of Preferred Stock Acquired by FSLIC in Connection with the Acquisition by Plaintiffs Holland and Ross of All of the Voting Stock of River Valley I**

 Defendant next argues that, even if the Court holds (as it does) that defendant is liable to plaintiff First Bank for breach of the River Valley I and II contracts, defendant is still not liable for the phase-out of $5,000,000 of preferred stock (purchased by FSLIC pur-

---

**20.** The Government also argues that, in order to be consistent with *Perpetual Financial Corp.,* this Court must hold that Section 25 of the Assistance Agreements prevented River Valley III from succeeding to River Valley II's claims. Def.'s Second Suppl. Br. at 2. *Perpetual Financial Corp.* involved a Successors and Assigns clause identical to Section 25 of the Assistance Agreements. *Id.* at Ex. A. In *Perpetual Financial Corp.,* the court determined that in view of the failure to obtain FSLIC approval, "there [was] no assignment, transfer of rights, or novation...." *Perpetual Fin. Corp.,* 61 Fed.Cl. at 145. However, the question before this Court is not whether there was an assignment or transfer of rights under the Assistance Agreements; rather, as discussed *su-*

*pra,* the question is whether there was a transfer of a cause of action pursuant to the merger.

Even if the Court accepted defendant's argument with respect to the merger of River Valley I and II, only rights under the River Valley II Assistance Agreement would potentially be affected because the River Valley I Assistance Agreement was not transferred, *i.e.,* River Valley I was the surviving entity in the merger and simply retained its own rights under the River Valley I agreement. *See supra* at 233 ("River Valley III" used as a term of convenience to describe the post-merger surviving entity, technically River Valley I). Although this analysis would not apply to subsequent mergers, as noted above, by the time those mergers took place the Assistance Agreements had been terminated.

suant to the River Valley I Assistance Agreement) from regulatory capital computations in connection with the River Valley I contract. Although Judge Horn found against defendants on this issue in *Holland I*, defendant asserts that recent decisions of the Federal Circuit warrant reconsideration of the issue.

First, defendant contends that because none of the contractual documents set forth a promise by the Government to allow River Valley to include the preferred stock in its regulatory capital, and because the contract documents expressly set forth the forbearance promises relating to goodwill, subordinated debentures, and capital credits, the contract's silence with respect to the preferred stock must be read to exclude a promise to allow the stock to count as regulatory capital. *See* Def.'s Resp. at 47–51. Second, defendant argues that the *Holland I* decision: (1) misconstrued the RCMA upon which the court partially relied to find a contractual promise regarding the preferred stock, *see id.* at 51–52; (2) erred in several ways with respect to its conclusion that a contractual obligation must have existed because River Valley and Holland and Ross would not have been willing to risk a sudden change in regulation that would have left River Valley I out of capital compliance, *see id.* at 52–54; and (3) erroneously integrated the RCMA into the contract, thereby rendering nugatory the Entire Agreement clause (section 23) of the Assistance Agreement, in contrast to the subsequent decisions of the Federal Circuit in *SoCal* and *Barron Bancshares*. *See id.* at 54. Third, defendant asserts that the inclusion of the preferred stock in regulatory capital computations set forth in the business plan submitted by Holland and Ross to the FHLBB and an internal FHLBB memorandum simply reflect that existing regulations called for the stock to be included in regulatory capital, and that such inclusion did not reflect a contractual promise to treat the stock as regulatory capital (as the *Holland I* court concluded it did). *See id.* at 54–55. Defendant further argues that, in light of *SoCal*, even assuming that the documents reflected "something more than the application of existing regulations," the Entire Agreement clause precludes the inte-

gration of any promises reflected in the business plans and the FHLBB memorandum into the River Valley I contract. *Id.* at 55–56.

Plaintiff responds that defendant has failed to identify any new material evidence, any intervening change of controlling legal authority, or any grounds upon which to conclude that the court's previous ruling was manifestly erroneous, and therefore Judge Horn's conclusion that a contractual promise existed with respect to the preferred stock should remain undisturbed. *See* Pl.'s Reply at 24 (quoting *Wolfchild v. United States*, 68 Fed.Cl. 779, 785 (2005)). Plaintiff asserts that *SoCal* and *Barron Bancshares* "are not controlling authority on the fact question whether the parties intended to include the FSLIC preferred as a contractual element of regulatory capital. Nor do they announce new law." *Id.* at 25. Plaintiff asserts that these cases do not alter the Federal Circuit's instruction that courts should consider "contemporaneous documents and surrounding circumstances" in order to determine whether a *Winstar*-type contract exists and that the earlier ruling with respect to the preferred stock is consistent with that principle. *Id.* (quoting *Winstar*, 64 F.3d at 1540). Plaintiff also asserts that new factual material that defendant cites (declarations by former FSLIC officials, J. Richard Earle and Herbert J. Held) do not undermine Judge Horn's analysis. *See id.* at 26.

The Court believes that the *SoCal* and *Barron Bancshares* decisions represent significant developments with respect to the Federal Circuit's treatment of integration clauses virtually identical to the Entire Agreement clause at issue here. The Court further concludes that *SoCal* is on point as to this issue. That decision, as well as *Barron Bancshares*, therefore warrants reconsideration of the ruling in *Holland I* that the River Valley I contract included a promise to allow the inclusion of the preferred stock in River Valley I's regulatory capital.

In order to discern a contractual promise regarding the River Valley I preferred stock, the *Holland I* court looked to documents other than the Assistance Agreement, the

FHLBB resolution, and the forbearance letter that comprised the River Valley I contract. *See Holland I*, 57 Fed.Cl. at 562–65. FHLBB Resolution 88–638 authorized River Valley I to issue preferred stock to FSLIC, and authorized FSLIC to purchase the preferred stock "in an amount not to exceed $5,000,000...." JA 4996; *Holland I*, 57 Fed. Cl. at 545. In the River Valley I Assistance Agreement, FSLIC agreed to purchase 50,-000 shares of River Valley I preferred stock for $5,000,000. JA 4835. Although Resolution 88–638 and the Assistance Agreement both expressly promised that River Valley could count $8,000,000 of the FSLIC cash contributions and the $4,600,000 subordinated debenture in its regulatory capital, neither document expressly promised such treatment specifically for the $5,000,000 in preferred stock, nor did the forbearance letter contain such an express promise. However, "[t]he terms of 12 C.F.R. § 561.13(d) at the time of the [River Valley I] transaction explicitly stated that preferred stock would be treated as regulatory capital." *Holland I*, 57 Fed.Cl. at 563 (citing 12 C.F.R. § 561.13(d) (1988)).[21] Defendant maintained then, as it does now, that the inclusion of the preferred stock in regulatory capital computations resulted solely from this regulation and not from a contractual promise. The court, however, disagreed and stated that "[t]he significance of 12 C.F.R. § 561.13(d)(1)(ii) is the parties' understanding, evidenced through the transaction documents, that to effectuate the purpose of the acquisition of Galva, Home, and Mutual by River Valley I, the regulatory capital requirements of River Valley I had to be met subsequent to the transaction." *Id.* The court then proceeded to analyze those "transaction documents."

The court first considered the business plan that Holland and Ross submitted to the FHLBB on March 23, 1988. *Id.* at 563. The business plan "indicated that the inclusion of the $5 million in preferred stock issued to the FSLIC had to be included in River Valley I's regulatory capital requirements subsequent to the acquisition of Galva, Home, and Mutual for the resulting institution to meet its regulatory capital requirements." *Id.* The business plan also "included the $5 million in preferred stock in the calculation of regulatory capital from March 31, 1988 through March 31, 1993, to show that the resulting institution, after the acquisition of Galva, Home, and Mutual, would meet minimum regulatory capital requirements." *Id.* The court then considered a July 12, 1988 memorandum from Leo B. Blaber, Jr., Principal Supervisory Agent of the FHLBB of Chicago, Illinois to John Buckley, Jr., Secretary of the FHLBB, regarding the financial viability of the Holland and Ross business plan, which stated:

> In order to recapitalize the Institution, Messrs. Ross and Holland (the acquirers) have requested an accounting forbearance which would allow $8 million of the $33 million of FSLIC assistance to be credited to regulatory capital. In addition, $5 million in preferred stock will be issued to the FSLIC and a $4.6 million subordinated debt security will be issued, which will be purchased by the American National Bank and Trust Company of Chicago. The total regulatory capital of the institution at the time of merger will total $17.6 million or 8.38% of assets.

*Id.* (quoting the FHLBB internal memorandum).

Finally, the court considered the RCMA that Holland, Ross, River Valley I, and FSLIC executed on July 29, 1988, which "addressed the plaintiffs' obligation to maintain the required regulatory capital require-

---

**21.** At the time of the River Valley I transaction, 12 U.S.C. § 561.13(d) provided in relevant part:
The term "regulatory capital" also includes:
(1) Preferred stock that is redeemable at the option of the issuer (I) which was issued prior to July 23, 1985, or (ii) which was issued after July 23, 1985: *Provided,* That the form of the security was approved prior to issuance pursuant to § 563.1 of this subchapter and states that no redemption may be made by the issuing insured institution if, after giving effect to

such redemption, the insured institution would fail to meet its regulatory capital requirement under § 563.13 of this subchapter.
*Holland I*, 57 Fed.Cl. at 562 (quoting 12 U.S.C. § 561.13(d) (1988)). After the passage of FIRREA, OTS issued new regulations that prevented the type of preferred stock issued by River Valley I to the FSLIC from being included in River Valley I's core capital requirements. *Id.* (citing 54 Fed.Reg. 46,845, 46,859–60 (Nov. 8, 1989); 12 C.F.R. pt. 225, App. A (2003)).

ments in accordance with the applicable regulations." *Holland I,* 57 Fed.Cl. at 563. The court focused on the termination provision of the RCMA, which provided that the RCMA would terminate: (a) five years from the date of the agreement; (b) upon the redemption or transfer to Holland, Ross, or River Valley I of the preferred stock by FSLIC, or (c) upon the infusion, in cash or by merger, of $5,000,000 of additional capital into River Valley I. *See id.* at 563–64; JA 5022. The court found that "[t]herefore, the RCMA protected the FSLIC's investment of $5 million by the plaintiffs' guarantee that they would maintain the regulatory capital of River Valley I during the five years the preferred stock was treated as regulatory capital." *Holland I,* 57 Fed.Cl. at 564. The court concluded that "[t]he plaintiffs' contract claim that the $5 million in preferred stock was to be included in regulatory capital, as proposed by the plaintiffs' business plan, is supported by the terms of the RCMA." *Id.*

The *Holland I* court held that the business plan, the FHLBB memorandum, and the RCMA "evidence to the court that it was the parties' understanding that the $5 million of preferred stock purchased by the FSLIC was to be included in the computation of regulatory capital of River Valley I subsequent to the acquisition of Galva, Home, and Mutual." *Id.* The court further stated that the parties must have understood the contract to include a promise with respect to the preferred stock because Holland and Ross would not have been willing to risk a sudden change in regulations that would have required them to "come up with an additional $5 million to return River Valley I to regulatory capital compliance...." *Id.* The court therefore found that the parties contracted for the inclusion of the $5,000,000 of preferred stock as regulatory capital in the River Valley I transaction.

However, in its subsequent decision in *SoCal,* the Federal Circuit held, pursuant to an Entire Agreement clause virtually identical to that in the River Valley I Assistance Agreement, that it was improper to construe such an integrated assistance agreement to incorporate an RCMA. In *SoCal,* individual investor-plaintiffs sought to recover damages for breach of government promises regarding supervisory goodwill and capital credits. *See SoCal,* 422 F.3d at 1329. The Government argued that the Sole Benefit clause of the assistance agreement limited the benefits of the agreement to the institutional plaintiffs because the individual plaintiffs were not parties to the contract. *See id.* The Court of Federal Claims found that the Government's execution of the Assistance Agreement, the regulatory capital maintenance agreement (to which the individual plaintiffs *were* parties), and the promulgation by FHLBB of implementing resolutions on the same day evidenced one overall contract to which the individual plaintiffs were a party. *See id.* at 1327, 1329. The trial court determined that the Entire Agreement clause of the assistance agreement incorporated the regulatory capital maintenance agreement (and the individual plaintiffs as parties to it), and therefore there was a direct conflict between the Entire Agreement clause and the Sole Benefit clause that rendered the latter unenforceable. *See id.* at 1329.

The Federal Circuit reversed on the ground that the trial court's reading of the Entire Agreement clause was inconsistent with the plain meaning of the clause. *See SoCal,* 422 F.3d at 1329–30. The court stated:

> The Entire Agreement clause specifically incorporates only a) interpretations or understandings agreed to in writing by the parties; and b) resolutions or letters from the FHLBB or the FSLIC. The [regulatory capital maintenance agreement] does not constitute either of the types of documents integrated into the Assistance Agreement. It is a separate contract that involves additional parties and distinct promises, including its own Entire Agreement clause. The [regulatory capital maintenance agreement] does not purport to either interpret the Assistance Agreement or embody an understanding of the Assistance Agreement and there is no question that the [regulatory capital maintenance agreement] is not a resolution or letter from the government regulators.

*Id.* at 1330. The court further determined that the Sole Benefit and Entire Agreement

clauses prevented contractual terms from being supplied by documents other than those specified in the contract. *Id.* ("Furthermore, far from indicating that the Assistance Agreement and the [regulatory capital maintenance agreement] should be read as constituting one contract, the plain language of the Sole Benefit clause and the Entire Agreement clause evidences the parties' intent to limit the scope of the Assistance Agreement to its specified terms.") (citing *Barron Bancshares*, 366 F.3d at 1375).

As noted above, the Entire Agreement clause of the River Valley I Assistance Agreement is substantially identical to the Entire Agreement clause at issue in *SoCal*, except that it also incorporates "the Subscriptions for Shares of River Valley Savings Bank, F.S.B." JA 4884. As in *SoCal*, the RCMA is not an interpretation or understanding of the parties with respect to the Assistance Agreement, nor is it a resolution or letter from the FHLBB or FSLIC. Like the regulatory capital maintenance agreement in *SoCal*, the River Valley I RCMA contains its own Entire Agreement clause indicating that it stands alone as a separate, integrated agreement. *See* JA 5025. Like the *SoCal* assistance agreement, the River Valley I Assistance Agreement recognizes the RCMA as a separately-executed agreement. *See* JA 4808, 4821; *SoCal*, 422 F.3d at 1330. "Although the existence of the [regulatory capital maintenance agreement] is acknowledged by the Assistance Agreement, the [regulatory capital maintenance agreement] itself is neither explicitly incorporated into the Assistance Agreement nor implicitly incorporated by the Entire Agreement clause." *SoCal*, 422 F.3d at 1330 (citing *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1434 (Fed.Cir.1996)). In contrast to Section III.B., *supra*, in which the Court found that the FHLBB was a party to the River Valley I contract due to the incorporation of the FHLBB resolution and forbearance letter, it appears that *SoCal* precludes the Court from looking to the RCMA to evidence terms of the River Valley I contract (which is limited to the documents enumerated in the Assistance Agreement's Entire Agreement clause).

The same analysis applies to the business plan and the FHLBB memorandum. Neither of these documents constitutes a written interpretation or understanding of the Assistance Agreement by the parties or a resolution or letter of the FHLBB or FSLIC. Furthermore, in *Barron Bancshares*, the Federal Circuit again interpreted an integration clause that was virtually identical to the Entire Agreement clause here. *See Barron Bancshares*, 366 F.3d at 1375 & n. 11. "We have stated that an integration clause 'conclusively establishes that the integration is total unless (a) the document is obviously incomplete or (b) the merger clause was included as a result of fraud or mistake or any other reason to set aside the contract.'" *Id.* at 1375 (quoting *Rumsfeld v. Freedom N. Y., Inc.*, 329 F.3d 1320, 1329 (Fed.Cir.2003)). The court therefore found that the trial court erred by considering extrinsic evidence to determine that the incorporated FHLBB resolutions and forbearance letter were not contractual in nature. *See id.* The court also noted that given the lack of ambiguity in the contract, "[e]vidence of the parties' course of dealing constitutes this kind of parol evidence that is prohibited by the [parol evidence] rule." *Id.* (citing *Alves v. United States*, 133 F.3d 1454, 1459 (Fed.Cir. 1998)). Given the plain language of the Entire Agreement clause, therefore, it appears that the Court is precluded from looking to the business plan and the FHLBB memorandum as evidence of a promise that is otherwise absent from the integrated River Valley I contract.

Furthermore, plaintiff's argument that, pursuant to the *en banc* decision of the Federal circuit in *Winstar*, the court must examine all contemporaneous documents and circumstances to determine the existence of a contract is irrelevant here. As in *Barron Bancshares*, the question here is not the existence of a contract, but rather the construction of an integrated agreement. *See Barron Bancshares*, 366 F.3d at 1375 ("In this case, however, the court was not faced with the question of whether a contract existed; rather, the task before the court was to construe what was conceded to be a fully integrated agreement."). Indeed, defendant has never contested the existence of the Riv-

er Valley I contract or of that contract's regulatory capital forbearance promises made with respect to the FSLIC cash assistance and the subordinated debt. *See Holland I*, 57 Fed.Cl. at 562. The Entire Agreement clause prevents the Court from adding to the integrated River Valley I contract alleged promises which are evidenced only by extrinsic documents such as the RCMA, the FHLBB memorandum, and the business plan.

Without the RCMA, the business plan, and the FHLBB memorandum, the contract documents are devoid of a promise by the Government to allow River Valley to include the preferred stock in its regulatory capital. The contract's silence regarding the treatment of preferred stock is not an ambiguity; rather, it reflects absence of any promise, especially in light of the fact that the contract documents specifically enumerated the other regulatory capital promises. Therefore, the contract documents (*i.e.*, the FHLBB resolution, Assistance Agreement, and forbearance letter) show that the preferred stock was included in regulatory capital only because the existing regulations specifically called for such treatment, in contrast to the promises with respect to the subordinated debt and the $8 million of the capital credit, forbearances from the application of GAAP for which River Valley bargained. *See* JA 5000–01.

## VI. Plaintiffs' Implied–in–Fact Contract Claims Are Precluded by the Existence of Express Contracts Dealing With the Same Subjects

Count IV of the Third Amended Complaint alleges that, in the event any of the contractual promises comprising the River Valley I and River Valley II transactions were invalid when made, then the parties' conduct demonstrates the existence of one or more implied-in-fact contracts (not including the invalid promises) in which plaintiffs Holland and Ross and River Valley I and II conferred benefits upon the Government for which the Government agreed to pay fair value. *See* Third Am. Compl. ¶¶ 89–91. All three plaintiffs seek damages under Count IV. *See id.* at ¶ 91. Defendant's cross-motion for summary

judgment seeks the dismissal of Count IV on the ground that, as a matter of law, plaintiffs' implied-in-fact contract claims are precluded by the existence of express contracts between the Government and the plaintiffs covering the same subject matter. *See* Def.'s Resp. at 57–58; Def.'s Reply at 28–29.

In its Opinion and Order of January 7, 2005, the Court stated that:

> [t]he Court's finding in *Holland I*, that Messrs. Holland and Ross were parties to express contracts that address the terms of the River Valley I and River Valley II acquisitions, renders the implied-in-fact contract claims of Messrs. Holland and Ross set forth in Count VI of the second amended complaint moot. However, because the case has not reached the point of entering judgment, and because the Court's decision in *Holland I* may still be appealed, dismissal of the implied-in-fact contract claims of Messrs. Holland and Ross is inappropriate at this time....

*Holland v. United States*, No. 95–524C, slip op. at 4–5 (Fed.Cl. Jan. 7, 2005) (docket entry 205). The Court has now addressed all remaining issues with respect to defendant's liability on the express contract claims and has determined to grant summary judgment in favor of plaintiff First Bank with respect to liability on such claims. Judge Horn previously granted summary judgment for plaintiffs Holland and Ross with respect to liability on the express contract claims. Accordingly, and upon further reflection, the Court has concluded that it is now appropriate to address defendant's challenge to the implied-in-fact contract claims of all plaintiffs.

"The existence of an express contract precludes the existence of an implied contract dealing with the same subject, unless the implied contract is entirely unrelated to the express contract." *Atlas Corp. v. United States*, 895 F.2d 745, 754–55 (Fed.Cir. 1990) (citing *ITT Fed. Support Servs. v. United States*, 531 F.2d 522, 528 n. 12, 209 Ct.Cl. 157, 168 n. 12 (1976)); *see Trauma Serv. Group v. United States*, 104 F.3d 1321, 1326 (Fed.Cir.1997). The integrated Assistance Agreements, which incorporated the FHLBB resolutions and forbearance letters,

constituted express contracts setting forth the promises which form the bases of plaintiffs' claims in this case. The implied-in-fact contracts alleged by plaintiffs are not unrelated to the express contracts, but rather are alleged to manifest the same contractual promises as the express agreements. Neither party has suggested any reason why any of the promises forming the River Valley I and River Valley II contracts would be invalid as a matter of law. The express contracts between the Government and plaintiffs concerning the River Valley I and River Valley II transactions therefore preclude the existence of the implied-in-fact contracts alleged by plaintiffs. Defendant's cross-motion for summary judgment on liability must be granted insofar as it relates to the implied-in-fact contract claims set forth in Count IV of the Third Amended Complaint.

### CONCLUSION

For the reasons set forth above, plaintiff First Bank's motion for summary judgment on liability is GRANTED IN PART and defendant's cross-motion for summary judgment on liability is DENIED IN PART with respect to breach of the express River Valley I and II contracts, *i.e.*, the Court holds that defendant is liable to plaintiff First Bank for breach of the express contracts. Plaintiff's motion for summary judgment on liability is DENIED IN PART and defendant's cross-motion for summary judgment on liability is GRANTED IN PART with respect to the phase-out of $5,000,000 of River Valley I preferred stock from regulatory capital computations, *i.e.*, the Court holds that defendant is not liable to plaintiff First Bank for the change in regulatory treatment of the preferred stock. Plaintiff's motion for summary judgment on liability is DENIED IN PART and defendant's cross-motion for summary judgment with respect to liability is GRANTED IN PART with respect to plaintiff's implied-in-fact contract claims, and the Court holds that defendant is entitled to summary judgment in its favor on the claims of all plaintiffs alleging breach of implied-in-fact contracts. The Court will issue a subsequent opinion addressing the parties' cross-motions for summary judgment insofar as they relate to damages.

IT IS SO ORDERED.